# EXHIBIT A



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

WCE / ALL<br>
Transmittal Number: 8723875<br>
Date Processed: 05/12/2011

| | |
|---|---|
| **Primary Contact:** | Kenneth M Vittor Sr.<br>The McGraw-Hill Companies, Inc.<br>1221 Ave. Of The Americas<br>Floor 48TH Legal Dept. -<br>New York, NY 10020 |
| Copy of transmittal only provided to: | Lee Malik |

| | |
|---|---|
| **Entity:** | The McGraw-Hill Companies, Inc.<br>Entity ID Number 0512782 |
| **Entity Served:** | The McGraw-Hill Companies Inc. |
| **Title of Action:** | Attorney General Jim Hood vs. The McGraw-Hill Companies Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court/Agency:** | Hinds County Chancery Court, Mississippi |
| **Case/Reference No:** | G2011-835-S/2 |
| **Jurisdiction Served:** | Mississippi |
| **Date Served on CSC:** | 05/11/2011 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Sender Information:** | Blake A. Tyler<br>601-949-5000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI

Attorney General Jim Hood, *ex rel.*
State of Mississippi,

        Plaintiff

      vs.                        Civil Action No.: 62011-835
                                                      5/2

The McGraw-Hill Companies, Inc.,
Standard & Poor's Financial Services, LLC,
Moody's Corporation and Moody's Investors Service, Inc.,

        Defendants

## STATE OF MISSISSIPPI

TO:   **The McGraw-Hill Companies, Inc.**
        **c/o Prentice-Hall Corporation System (registered agent for McGraw-Hill Compaies)**
        **506 South President Street**
        **Jackson, Mississippi 39201**

THE COMPLAINT ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE
IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU HAVE BEEN MADE A DEFENDANT
IN A COMPLAINT FILED IN THIS COURT BY THE PLAINTIFF. You are hereby required to mail or
hand deliver a copy of a written response to the Complaint to Blake A. Tyler, attorney for plaintiff,
whose address is 775 East Fortification Street, Jackson, Mississippi 39202. Your response must be
mailed or delivered within thirty (30) days from the date of delivery of this summons and complaint or a
judgment by default may be entered against you for the money or other things demanded in the
complaint. You must also file the original of your response with the Clerk of this Court within a
reasonable time afterward.

ISSUED UNDER MY HAND, this the 10th day of May, 2011.

                                 EDDIE JEAN CARR, CHANCERY CLERK
                                 P.O. BOX 686
                                 JACKSON, MS 39205

                    BY:                            
                              DEPUTY CLERK

**IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT**
**OF HINDS COUNTY, MISSISSIPPI**

**F I L E D**

**MAY 1 0 2011**

EDDIE JEAN CARR, CHANCERY CLERK

BY_____ D.C.

**STATE OF MISSISSIPPI, *ex rel.***
**JIM HOOD, ATTORNEY GENERAL**

        **Plaintiff**

    **vs.**

Civil Action No.:

G 2011·835 ⅗

**THE McGRAW-HILL COMPANIES, INC.,**
**STANDARD & POOR'S FINANCIAL SERVICES, LLC,**
**MOODY'S CORPORATION AND**
**MOODY'S INVESTORS SERVICE, INC.**

        **Defendants**

**COMPLAINT**

COMES NOW, the Honorable Jim Hood, Attorney General for the State of Mississippi, on behalf of the State of Mississippi, by and through the undersigned counsel, and files this Complaint against Defendants The McGraw-Hill Companies, Inc.; Standard & Poor's Financial Services, LLC; Moody's Corporation; and Moody's Investors Service, Inc.; and in support thereof, would show unto the Court as follows:

**I.    INTRODUCTION**

1.     This lawsuit seeks redress from The McGraw-Hill Companies, Inc.; Standard & Poor's Financial Services, LLC and its business unit Standard & Poor's Ratings Services (hereinafter referenced collectively as "S&P"); and Moody's Corporation and Moody's Investors Service, Inc. (hereinafter referenced collectively as "Moody's"); for their unfair and deceptive

- 1 -

business practices of intentionally and systematically misrepresenting as independent, objective and competent, their ratings services for structured finance securities, in violation of Miss. Code Ann. § 75-24-5. These assurances were deceptive and false, and they enriched Defendants by billions of dollars while harming Mississippi consumers, including the banks, insurance companies, government regulators, mutual funds, and pension funds that relied on these assurances when deciding to purchase certain securities. Government regulators also were harmed because they relied on these assurances when using information provided by Defendants to determine the capital reserves necessary for banks and insurance companies and to assess the relative health of the entities conducting business and issuing policies within the State of Mississippi.

2.        Plaintiff, the Attorney General for the State of Mississippi, in the name of the State of Mississippi, seeks penalties pursuant to Miss. Code Ann. § 75-24-19, injunctive relief pursuant to Miss. Code Ann. § 75-24-9, and other equitable relief pursuant to Miss. Code. Ann. § 75-24-11 for Defendants' practices of (1) knowingly and willfully misrepresenting their business model and services as objective and independent, and (2) knowingly and willfully misrepresenting their competence to rate certain structured finance securities.

3.        Defendants, Moody's and S&P, are the two largest rating agencies. Each assigns ratings for approximately 90% (ninety percent) of all structured finance securities (structured finance securities generally receive ratings from two credit rating agencies).

4.        Credit ratings agencies ("CRAs") achieved critical importance in the 1970s

when the U.S. Securities and Exchange Commission ("SEC") designated the three biggest agencies – S&P, Moody's and Fitch – as "Nationally Recognized Statistical Rating Organizations" ("NRSROs").    Since that time, other CRAs have obtained the NRSRO designation – but S&P, Moody's and Fitch remain the largest.  The NRSRO designation has the effect of making these CRAs "gatekeepers" in the financial markets, because banks issuing the securities must obtain a rating from at least one (and usually two) NRSROs before they can sell the security.  As such, the integrity of these CRAs – including their ability to be objective and independent, and to be competent to render the services they advertise – is essential to the rating agency business model and to the stability of the financial industry overall.

5.      Defendants disseminated these assurances in every manner possible – including in their annual reports, on their websites, in their Codes of Conduct, in press releases accompanying the issuance of a new security or rating, in newspaper articles, and even in sworn testimony before the United States Congress and other governmental entities.  Without these guarantees of independence, objectivity and competence, the ratings services that Moody's and S&P provided would have had little or no value.

6.      These representations took on particular importance during the housing boom of the early to mid-2000s, when Defendants increasingly focused on rating certain types of securities known as "structured finance securities."   Structured finance securities include asset-backed securities (*i.e.*, securities based on pools of assets such as credit card or student loan debt), commercial mortgage-backed securities, and structured investment vehicles. The manner

- 3 -

in which the CRAs structured their business models for rating residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") provides a key illustration of the serious and deceptive disconnect between Defendants' assurances about the integrity of their services and the reality of their business model.

7.     During the housing boom, the demand for ratings of RMBS and CDOs increased exponentially.  Investment banks compensate CRAs to rate RMBS and CDOs at a rate that is up to three times (3X) higher than the banks pay CRAs to rate traditional bonds.  Moody's and S&P's profits increased significantly as more of these profitable RMBS and CDOs became available to rate.  By 2006, structured finance securities (including RMBS and CDOs) comprised more than fifty percent (50%) of Moody's total $1.6 billion revenue and approximately forty percent (40%) of S&P's total $2.7 billion revenue. From 2002 to 2008, investment banks issued between $1 and $2 trillion *each year* in new RMBS, and from 2003 to 2007, more than $700 billion in CDOs.  Upon information and belief, fees for RMBS alone equaled approximately $1 billion in revenue *per year* for the Defendants. This flood of available revenue ultimately tainted the integrity of Defendants' business models because the CRAs allowed themselves to rate increasingly complex and speculative deals on an accelerated timeline dictated by the issuing banks and the vast revenue these banks provided.  By at least 2006, Defendants knew that the models they had been using were deficient and they began revising their models, but they waited at least a year to inform the public of this information – all the while continuing to rate thousands of speculative securities using outdated and unreliable models.  The result was that the CRAs

- 4 -

compromised their hallmark advertisements of independence, objectivity and competence by acting in a manner that valued profits over honesty, accuracy, and integrity. Defendants knew that putting their stamp of approval on these structured finance securities – in the form of "investment grade" ratings – would result in public reliance on these ratings, because the public trusted Defendants' assurances that the CRAs operated in a manner that guaranteed independence, objectivity and competence.

8.      The Financial Crisis Inquiry Commission ("FCIC") concluded that the "credit rating agencies were key enablers of the financial meltdown. The mortgage-related securities at the heart of the crisis could not have been marketed and sold without their seal of approval. . . . This crisis could not have happened without the rating agencies. Their ratings helped the market soar and their downgrades through 2007 and 2008 wreaked havoc across markets and firms."

9.      United States Senator Carl Levin described the problem in his April 22, 2010 press release accompanying the Permanent Subcommittee on Investigation's formal findings of fact with regard to the ratings agencies. "From 2002 to 2007, the credit rating agencies earned record profits, reporting $6 billion in gross revenues in 2007. They also allowed the drive for profits and market share to affect ratings. Knowing that Wall Street firms might take their business elsewhere if they didn't get [the ratings they wanted], the agencies were vulnerable to pressure from issuers and investment bankers. . . . After it became clear that their [analytic] models failed to accurately predict the performance of securities tied to risky mortgages, the agencies began revising those models. But they took until July 2006 [to do so], and in a decision

- 5 -

with severe consequences for the market and the economy, refused to apply the revised model to existing securities. . . . [T]he agencies waited until July of 2007[] to begin a series of mass downgrades. The sudden shock of those downgrades contributed to the collapse of the secondary markets for subprime residential mortgage backed securities (RMBS) and collateralized debt obligations (CDOs) . . . and helped precipitate the financial crisis."

10.     As United States Representative Henry Waxman stated during a House Committee on Oversight and Government Reform hearing, "[t]he story of the credit rating agencies is a story of a colossal failure. The credit rating agencies occupy a special place in our financial markets. Millions of investors rely on them for independent objective assessments. The rating agencies broke this bond of trust. . . ."

11.     The Mississippi Consumer Protection Act ("MCPA" or "Consumer Protection Act") prohibits, among other things, "[m]isrepresentation of affiliation, connection, or association with, or certification by another;" "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .;" "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "[m]isrepresentation of the . . . certification of goods or services." Miss. Code Ann. §§ 75-24-5(2) (b) (c), (e), (g).

12.     Defendants advertised to Mississippi consumers, investors, insurance regulators and pension funds (among others) that their services were predicated on a business model that was objective, independent and competent. Moody's and S&P made these representations on

- 6 -

their websites, in press releases accompanying ratings and, upon information and belief, through documents mailed to shareholders and investors and via other media.

13.      Mississippi consumers purchased securities rated by Defendants because Defendants advertised themselves as objective, independent and competent.  These assurances misrepresented the true nature of Defendants' services because the CRAs allowed their compensation structure, desire for profits and fear of losing investment bank clients to taint the integrity of their businesses.  This deception affected Mississippi banks, insurance companies, pension funds and mutual funds that purchased the securities, and all of the consumers in Mississippi whose retirement monies were invested in pension or mutual funds that included these securities.  Mississippi government entities, including insurance regulators, also relied on Defendants' assurances of independence, objectivity and competence when utilizing information provided by Defendants to determine the quality of reserves held by insurance companies and the solvency of businesses in the State of Mississippi.

14.      The ratings assigned to structured finance securities, and the performance of those investments, have significant, real-world implications for government regulators in the State of Mississippi, for the overall economy of the State of Mississippi, for Mississippi consumers whose  retirement funds are invested in these securities, and for Mississippi institutional investors – such as pension funds and 401k managers – that make decisions about whether and which of these securities are appropriate investments.  Structured finance securities often are included in mutual fund and pension fund portfolios that play significant roles in the

retirement and investment strategies of Mississippi consumers.   Lenders, businesses and government regulators rely on CRAs' to conduct their operations objectively, independently and competently.   Banks and broker-dealers calculate their net capital requirements based on the ratings assigned to the securities they own.  Insurance regulators use the ratings to calculate the strength of the reserves held by insurance companies.

15.      Pursuant to Miss. Code Ann. § 75-24-19, the Attorney General seeks civil penalties in an amount not to exceed Ten Thousand Dollars ($10,000.00) for each violation of § 75-24-5, injunctive relief pursuant to Miss. Code Ann. § 75-24-9; and equitable relief, including disgorgement of profits pursuant to Miss. Code Ann. § 75-24-11 and § 75-24-19, Mississippi common law, and any other claim this Honorable Court may enforce. The Attorney General also seeks an injunction against S&P and Moody's to prohibit their future use of these unfair or deceptive business practices.

16.      The Attorney General disclaims any federal remedies and does not assert herein any claim for relief or seek any remedy arising out of a federal statute, federal regulation or provision of federal common law.

## II.    JURISDICTION AND VENUE

17.      Jurisdiction and venue are proper pursuant to Miss. Code Ann. §§ 11-11-3 and 75-24-9.

- 8 -

## III.   PARTIES

18.     Plaintiff State of Mississippi, through Jim Hood in his sovereign enforcement capacity as the Attorney General, brings this action pursuant to Miss. Code Ann. § 75-24-9, for violations of Miss. Code Ann. § 75-24-5, and seeks civil penalties pursuant to Miss. Code Ann. § 75-24-19 and injunctive relief pursuant to Miss. Code Ann. § 75-24-9, and equitable relief pursuant to Miss. Code Ann. § 75-24-11.  Additionally, Plaintiff asks that Defendants disgorge illegally obtained profits and/or fees.

19.     Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill") is a New York corporation with its principal place of business at 1221 Avenue of the Americas, New York, NY 10020.  McGraw-Hill is registered with the Mississippi Secretary of State to conduct business in the State of Mississippi, and may be served with process through its registered agent domiciled in Hinds County, Mississippi, the same being Prentice-Hall Corporation System, 506 South President Street, Jackson Mississippi 39201.

20.     Defendant Standard & Poor's Financial Services LLC is a Delaware limited liability company and wholly owned subsidiary of Defendant McGraw-Hill with its principal place of business at 55 Water Street, New York, NY 10041.  Within Standard & Poor's Financial Services LLC is the business unit Standard & Poor's Rating Services, which operates a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, which are issued and published in domestic and international financial markets.

- 9 -

21.     S&P regularly conducts business in the State of Mississippi and derives substantial revenue from its business within the State of Mississippi.

22.     Defendant Moody's Corporation is a Delaware corporation with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.

23.     Moody's Corporation is divided into two divisions: Moody's Investors Service, Inc. and Moody's Analytics (collectively, "Moody's").   Defendant Moody's Investors Service, Inc. is a Delaware corporation with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.  Moody's Investors Service, Inc. is a division and subsidiary of Moody's Corporation and operates as a credit rating agency that assigns credit ratings on a broad range of securities, including structured finance securities, issued in domestic and international financial markets.  Moody's regularly conducts business in the State of Mississippi and derives substantial revenue from its business within the State of Mississippi.

IV.   **DEFENDANTS PROMISED TO BE INDEPENDENT, OBJECTIVE AND COMPETENT**

24.     Defendants S&P and Moody's are the two largest CRAs, a status they could not have achieved without persistent efforts to convince the public of their objectivity, independence and competence.   Without a reputation for objectivity, independence and competence, Defendants would be out of business because the services they provide would be useless.

25.     S&P and Moody's have gone to great lengths to advertise their independence

- 10 -

and objectivity as hallmark traits of their businesses.  For example:

a)   S&P and Moody's annual reports also tout these qualities.  These annual reports are a medium for advertising the strength and success of the companies to their shareholders, investors and potential clients.  Upon information and belief, Defendants send these annual reports to investors and shareholders directly.

i)   Moody's 2005 annual report represents that   "Moody's is committed to reinforcing among all relevant stakeholders – debt issuers, the investment community, employees, governmental authorities and shareholders – a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business."  Moody's used similar language to advertise its independence in every annual report between 2002 and 2010.  Language regarding its objectivity also appears in every annual report between 2000 and 2003, and from 2006 through 2010.  Moody's 2007 Annual Report vows to "set[] industry standards regarding the management of potential conflicts" through the Moody's Code, which has "rigorous" conflict procedures "with the primary goal of ensuring that [Moody's] analytical activities remain appropriately distanced from the commercial management of our business."   In the same 2007 Annual Report, Moody's CEO Raymond McDaniel acknowledged the conflicts of interest inherent in the company's compensation structure, but emphasized that "[a]t Moody's, we have taken a leadership position in setting industry standards regarding the management of potential conflicts.  Our Code of Professional Conduct sets forth rigorous procedures that govern the roles and responsibilities of our rating agency employees,

- 11 -

with the primary goal of ensuring that our analytical activities remain appropriately distanced from the commercial management of our business."   Moody's makes similar representations about its ability to manage conflicts of interest in each annual report between 2002 and 2009.

        ii)      In 2004, McGraw-Hill's Annual Report (which contains a section devoted to S&P, hereinafter referred to the "S&P annual report") stated that the company "provides investors with the independent benchmarks they need to feel more confident about their investment and financial decisions."   Similarly, McGraw-Hill's 2006 annual report represents that "[m]any investors know [S&P] for its respected role as an independent provider of credit ratings. . . . As financial markets grow more complex, the independent analysis . . . offered by [S&P] [is] an integral part of the global financial infrastructure."   The 2007 report boasted that, "[s]ince 1916, markets across the globe have relied on the independent analysis and integrity of Standard & Poor's credit ratings."   Similar language advertising S&P's independence has appeared in every S&P annual report since at least 2003.

        b)      Both Moody's and S&P codified their vows of independence, objectivity and integrity in their public Codes of Conduct.   The Codes of Conduct for both Defendants promise independence and objectivity, stating that the CRA is "not . . . affected by the existence of, or potential for, a business relationship between [the CRA] . . . and the Issuer. . . ."

        i)      The Moody's Code, first adopted in June 2005 (and, upon information and belief, since its inception), emphasizes the "objectivity and transparency" of the its rating process and highlighted the principals of independence that the International

- 12 -

Organization of Securities Commissions Code of Conduct Fundamentals for Credit Rating Agencies ("IOSCO Code") established.   Moody's Code is consistent with the goals of the IOSCO, whose central purpose was to "promote investor protection by safeguarding the integrity of the rating process" because credit ratings "exist primarily to help investors assess the credit risks they face when making certain kinds of investments."  Moody's Code also promises that "[t]he determination of a Credit Rating will be influenced only by factors relevant to the credit assessment."  In keeping with this, the Moody's Code promises to implement policies that "eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses" it offers.  Moody's Code also states that its services are designed to "help[] investors and others sift through [the vast amount of information available to investors] and analyze the credit risks they face when lending to a particular borrower, or when purchasing an issuer's debt or debt-like securities."  Upon information and belief, the Code has contained this language since S&P adopted it.

ii)     S&P's Code of Conduct, which is also consistent with the goals and principals of the IOSCO Code (and, upon information and belief, has included similar language since its inception in 2005), likewise advertises S&P's "mission . . . to provide high-quality, objective, independent, and rigorous analytical information to the marketplace."  The S&P Code also assures consumers, shareholders, investors and regulators that S&P "endeavors to conduct the rating and surveillance processes in a manner that is transparent and credible and that also maintains the integrity and independence of such processes in order to avoid any

- 13 -

compromise by conflicts of interest, abuse of confidential information, or other undue influences."

        c)     Other portions of Moody's and S&P's websites also advertise their independence, objectivity and competence.

        i)     Moody's website proclaims that its "independent credit ratings and research" contribute to market efficiency "by providing credible and independent assessments of credit risk." Moody's online advertising brochure for its Structured Finance Research promises that "Moody's rigorous, transparent rating methodologies and analytic expertise help synthesize diverse perspectives and key factors driving structured finance credit quality. The result? Ratings and research that help you navigate markets with confidence."

        ii)     S&P's website emphasizes the company's integrity through independence, assuring consumers that "[m]ost notably, [S&P is] known as an independent provider of credit ratings." In a document available on its website, "The Fundamentals of Structured Finance Ratings," S&P acknowledges the risk that issuers will influence their analysis, and reassures investors in claiming, "[w]e are intensely aware that our entire franchise rests on our reputation for independence and integrity. Therefore, giving in to 'market capture' would reduce the very value of the rating, and is not in the interest of the rating agency."

        d)     Moody's and S&P also issue press releases to accompany the issuance of new ratings or ratings changes. These press releases are available on Bloomberg and on the CRAs' websites and other places accessible to the public.

    i)  Moody's press releases contain language promising to maintain procedures "to address the independence of [its] ratings and rating processes." Upon information and belief, Moody's has included the same or similar representations in all press releases accompanying the issuance of new ratings or ratings changes since at least 2004.

    ii)  S&P advertises to the public in its widely distributed press releases that it "is the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research and data," and that it provides investors with "independent benchmarks." S&P goes on to remind the public that it undertakes its analysis in such a way so as to "preserve the independence and objectivity" of its risk assessments. Upon information and belief, S&P makes the same or similar representations in most, if not all, of its press releases.

    e)  In Moody's 2005 Best Practices Handbook, it states that rating agencies "serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions."

    f)  The SEC requires Moody's to issue a disclosure regarding its fee arrangements. In this disclosure, Moody's represents that it "maintain[s] policies and procedures to address the independence, objectivity and integrity of [Moody's] ratings and rating processes." The disclosure also references the Moody's Code of Conduct.

    g)  S&P's emails contain language that emphasizes the company's integrity in analyzing securities, stating that "ratings and other analytic services are performed as entirely separate activities" and that this division preserves the "independence and objectivity of each

analytic process."

h)     In sworn testimony before the Senate Committee on Banking, Housing and Urban Affairs in April 2007, S&P's then managing director of RMBS testified that S&P's credit ratings were "grounded in the cornerstone principles of independence, transparency, credibility and quality" – themes reiterated by the testimony from the President of Standard & Poor's Financial Services LLC in October 2008, before the House Committee on Oversight and Government Reform: "[t]he key question for any approach, whether it be investor or issuer paid, is then whether the rating agency takes appropriate steps to preserve its independence. For S&P, that independence is a core principle of our business." The CRAs have made these assurances not only to Congress, but also in materials provided to the financial industry and public at large, in an effort to maintain and expand their market share and profits.

i)     S&P and Moody's also have made consistent and blanket proclamations of their competence and expertise, notably without any caveats for rating even the most exotic securities:

a)     The annual reports of both Defendants provide many examples:

i)     Moody's 2007 annual report promised "to bring the fullest range of perspective, knowledge and insight to the analysis of structured products." In that same annual report, Moody's also advertised its readiness and competence to meet "the demand for independent expertise in assessing credit and fostering consistent, comparative standards for credit should also grow accordingly." In the same annual report, Moody's asserted that, "as the

- 16 -

sophistication and complexity of derivative structures continues to grow, Moody's is deepening

the breadth of credit expertise [it] bring[s] to the analysis of even highly specialized transactions

through our rating committees."  It stated that it "draw[s] on the expertise of analysts from

different areas . . . to bring the fullest range of perspective, knowledge and insight to the analysis

of structured products."  Moody's advertises the quality and competence of its services in a

similar fashion in annual reports in 2002 and 2003, as well as 2006 through 2008.

ii)     S&P's 2007 annual report promises that its "capabilities

and expertise continue to expand to meet the complex demands of the global financial markets."

S&P made similar representations in each report issued from at least 2006 through 2008.

b)     Moody's 2006 Report on its Code of Professional Conduct

advertised that the company "seeks to employ Analysts who have the requisite skills and are

appropriately qualified for their positions, and who demonstrate good judgment and adhere to

high standards of integrity."  Additionally, "Moody's . . . employs a staff of professionals

specializing in accounting and financial reporting, off-balance sheet risk, corporate governance

and, for financial institutions, risk management assessment."

26.     These representations are material to financial market participants, consumers

and government regulators in Mississippi.  Consumers whose retirement funds are invested in

structured finance securities such as RMBS and CDOs depend on the integrity of Moody's and

S&P to behave in a manner that is – as promised –independent, objective and competent.

Similarly, government regulators in Mississippi, such as the Department of Insurance, depend on

- 17 -

the Defendants' promises of independence, objectivity and competence when using Defendants'

ratings to assess capital adequacy requirements and other indicia of the financial health of entities

that held structured finance securities on their balance sheets.  Without these promises, and the

ability to rely on them as accurate representations of the Defendants' business model, the ratings

themselves would be useless.  For this reason, Defendants' misrepresentations about the integrity

of the services they provide constitute deceptive practices under the Mississippi Consumer

Protection Act.

**V.     PUTTING DEFENDANTS' PROMISES IN CONTEXT: THE ROLE OF CRAs IN THE SECURITIZATION MARKET**

27.     The structured finance market consists mainly of issuers, institutional investors

that purchase the securities as investments and government regulators who rely on the ratings to

assess the financial strength of various businesses, and the CRAs themselves.  Issuers – typically

banks, mortgage companies or other financial institutions – create trusts that hold the collateral

underlying the RMBS and CDOs.  These banks also issue the securities (thus, the label

"issuers").  Institutional investors typically include pension funds, mutual funds, insurance

companies and other financial institutions.  While individual investors in Mississippi and

elsewhere generally are not "qualified investors" for purposes of purchasing RMBS or CDOs

directly, these structured finance products comprise part of many mutual fund and pension fund

portfolios for Mississippi residents and workers.  In addition, government regulators – including

the Mississippi Department of Insurance and the Mississippi Department of Banking and

- 18 -

Consumer Finance – rely on the CRAs to provide services that are independent, objective and competent, because the risk represented by complex securities is virtually impossible for these agencies or other participants in the financial marketplace to assess on their own.

28.      CRAs serve as gatekeepers between institutional investors and the structured finance securities those investors purchase. This gatekeeper role is important for several reasons. First, SEC regulations require many pension and retirement funds to purchase only those securities with an "investment-grade" rating (a rating of Baa or above for Moody's and BBB or above for S&P). In addition, unlike other kinds of debt securities (where the corporate bond has a verifiable collateral that allows for an assessment of the bond's value based on tangible information), structured finance products are far more opaque because the investor does not have access to information about the underlying collateral. As a former senior manager at Moody's noted, "the details of the underlying asset pool and often the structure of the transactions are not publicly available for external scrutiny" and "the tools to analyze credit . . . are beyond the grasp of many investors." Therefore, the nature of structured finance securities require even sophisticated, institutional investors and government entities to rely on the CRAs' promises of objectivity and independence, as well as on the implicit guarantee of competence to provide the services they advertise.

29.      Moody's rates securities on a scale of "Aaa" to "C," with each level down indicating a decrease in creditworthiness and an increase in investment risk. Moody's deems "Aaa" securities to be "of the highest quality, with minimal credit risk," and "Aa" securities to be

- 19 -

"of high quality and . . . subject to very low credit risk." Securities rated at "Baa" and above also receive the label "investment grade." For a debt obligation to be considered an "investment security," it must be "marketable." A security can qualify as "marketable" if it is: 1) offered via SEC Rule 144A, and 2) considered "investment grade" by recognized CRAs (or one CRA, if the security has received only one rating). The SEC and Mississippi law require an investment-grade rating for certain institutional investors, such as pension funds and insurance companies, to invest in the security.

30.      S&P uses a scale that rates securities from "AAA" through "D," with each level down indicating a decrease in creditworthiness and an increase in investment risk. Securities rated at BBB and above qualify for the label "investment grade."

31.      Institutional investors such as hedge funds, life insurers, state and private pension funds, and mutual funds are eligible to purchase RMBS and CDOs. Money market funds also may invest only in securities above a certain rating, *see* 17 C.F.R. § 270.2(a)-7. And as noted previously, certain kinds of investors (*e.g.*, state pension funds) may only purchase or hold securities with ratings at or above a certain level based upon their governing investment guidelines. As observed by former SEC Commissioner Richard Y. Roberts, "[m]ost financial institutions in the United States (banks, insurance companies, mutual funds, pension funds) are required by law to incorporate NRSRO ratings in their business decisions."

32.      As noted above, structured finance securities, including RMBS and CDOs, are issued based on a pooled collection of assets. To reduce the risk of any particular investment,

- 20 -

financial institutions create these "structured finance products" (a/k/a structured finance securities), which pool multiple assets of different risk profiles together. Grouping assets in this manner – a process known as securitization – is intended to diversify the overall risk and thus limits the loss an investor may suffer if any one of the assets in the pool defaults.

33.     One way to create a structured finance product is through an Asset-Backed Security ("ABS"). An ABS is a financial product that derives its value from a stream of revenue produced by a pool of underlying assets. While the assets in an ABS can be comprised of credit card receivables, student loans or any number of other loans/receivables, commercial and residential mortgages are the most common form of collateral used for ABS. The oldest and most common type of structured finance securities utilizes residential mortgages as the sole form of collateral, in a product called Residential Mortgage Backed Securities ("RMBS"). From 2000 to 2006 alone, investment banks underwrote nearly $2 trillion in mortgage-backed securities.

34.     Collateralized Debt Obligations ("CDOs") are similar to RMBS in some ways, but they are exponentially more complex because they typically are comprised of RMBS from multiple, different mortgage pools. For example, a single CDO could contain securities from hundreds of different RMBS mortgage pools, as well as other types of assets, such as commercial mortgage backed securities. When a CDO's underlying assets also include other CDOs, the new CDO is deemed a "squared" or "cubed" CDO – thus making information about the risk associated with the underlying collateral practically impossible for any investor to assess.

35.     All securities are divided into tiers (also called "tranches"), which represent

- 21 -

different levels of risk.  Each tranche receives a credit rating that reflects that risk.  The revenue stream created by the payment of the underlying loans represents the revenue paid to investors, and the investors in the "senior" tranches (those with the least credit risk) are paid first. Ultimately, the investors with the least senior tranches bear the greatest risk of not being paid at all because any loss in revenue – from, for example, unpaid mortgage payments – is absorbed by junior tranches first.

36.     The loan-level data underlying structured finance securities (which can include, among other things, the credit scores of borrowers, appraisal value of the property, loan-to-value ratios, loan-to-debt rations, and the income of the borrowers) is not readily available to the general public.  Also, the securities themselves are complex because they rely on a large asset pool that is sub-divided into tranches, and, in the case of CDOs, often do not contain a fixed pool of assets.  Therefore, investors and other marketplace participants must rely on the credit rating as a proxy for the investment's risk.

37.     Final ratings for structured finance products such as RMBS and CDOs are assigned by the CRAs themselves, and appear quickly after such assignment in prospectuses and media outlets such as Bloomberg and financial news websites.  The ratings (and changes in ratings) for some securities are publicly available in papers filed with the SEC, on the CRAs' websites, and through press releases by the CRAs.  As described above, the CRAs made many misrepresentations about their independence, objectivity and competence through these vehicles.

38.     With each level of securitization (and then re-securitization, from an RMBS

- 22 -

onward to a cubed CDO), investors become further and further removed from the actual collateral (in most cases, mortgages on houses) and the risks associated with that collateral (*i.e.*, the risk of default on the mortgage). Investors and other market participants rely on the CRAs' advertised independence, objectivity and competence as the precursor and prerequisite for accepting the rating as the product of an independent, objective and competent process. As Defendant Moody's itself stated in its 2005 Best Practices Handbook, rating agencies "serve investors by providing them with timely credit research and independent, thoughtful, and accurate rating opinions on which they can base their investment decisions."

39.   As Senator Levin noted in his comments before the Permanent Subcommittee on Investigations, "[b]ecause these so-called 'structured finance products' are so hard to understand, investors often place heavy reliance on credit ratings to determine whether they can or should buy them." The RMBS are arranged in complicated capital structures and rely on thousands of loans with unique risk factors. Rating them is next to impossible for most investors. Because CDOs are comprised of many RMBS and other securitized debt, and because the asset pool underlying a CDO is permitted to change over time, the CDO rating analysis is disconnected by at least two levels (and often more) from the actual collateral upon which the payments of the securities ultimately depend. As discussed below, the opacity of the data and impenetrability of the structure makes them effectively impossible to rate without the resources and purported expertise enjoyed by the CRAs. This complexity means that investors and other market participants must rely on the rating agencies for an assessment of the security's risk.

- 23 -

**VI.   DEFENDANTS' CONDUCT DEMONSTRATES THAT THEIR PROMISES OF
OBJECTIVITY, INDEPENDENCE AND COMPETENCE WERE DECEPTIVE**

    **A.   The "Issuer Pays" Model and Ratings Shopping Compromised the CRAs'
Independence and Objectivity**

    40.     In filings with the SEC, their own annual reports and websites, publicly

available codes of conduct, press releases, testimony under oath and via emails (among other

media), Defendants continuously represented that their services were based on a business model

that maintained independence, objectivity and competence.  These promises deceived consumers

because the CRAs allowed the Issuer Pays model to undermine the integrity of the services the

CRAs claimed to be providing.

    41.     Under the Issuer Pays model, issuers of the securities – generally, investment

banks – pay the CRAs to rate the investments.  The CRAs' astronomical increase in profits

through the housing boom was funded by a very small number of investment banks.  These banks

provided an overwhelming percentage of Defendants' ratings work for structured finance

securities.  Therefore, alienating even one of the banks would have reduced Defendants' revenue

and market share dramatically.  The banks were repeat players in this market, and "kn[e]w how

to exploit their leverage."  As a result, the CRAs had to cater to banks' desires or risk them

"tak[ing] their business elsewhere."  For example, this type of blatant pressure was captured in a

2006 email in which a United Bank of Scotland (UBS) banker warned an S&P senior manager

not to use a new, more conservative rating model for CDOs.  He wrote: "[H]eard you guys are

revising your residential [mortgage backed security] rating methodology—getting very punitive

- 24 -

on silent seconds.  [H]eard your ratings could be 5 notches back of [Moody's] equivalent. [G]onna kill your resi[dential] biz. [M]ay force us to do moodyfitch only cdos!"  When asked by his colleague about the change to the model, another senior manager, Thomas Warrack, noted that the new model "took a more conservative approach" that would result in "raising our credit support requirements going forward," but Mr. Warrack was quick to add "[w]e certainly did [not] intend to do anything to bump us off a significant amount of deals."

42.    Senator Levin explained how the booming securitization market, CRA revenues and the Issuer Pays model were all connected: "[T]he credit rating agencies were operating with an inherent conflict of interest because the revenues they pocketed came from the companies whose securities they rated.  It's like one of the parties in court paying the judge's salary or one of the teams in a competition paying the salary of the referee. The credit rating agencies assured Congress and the investing public that they could manage that conflict; that their ratings were independent and rigorous. But the documents tell a different story."  As Congressman Waxman explained, "[t]he leading credit rating agencies grew rich rating mortgage-backed securities and CDOs. . . . [T]he total revenues for the three firms, double from $3 billion in 2002 to over $6 billion in 2007. At Moody's, profits quadrupled between 2000 and 2007. In fact, Moody's had the highest profit margin of any company in the S&P 500 for 5 years in a row."

43.    In light of the explosion of RMBS and CDOS and because the banks paid higher fees to have Defendants rate these structured finance securities than they paid to have the CRAs rate traditional bonds, the CRAs allowed the Issuer Pays model to compromise their hallmark

- 25 -

promises of independence and objectivity. Although Defendants utilize the Issuer Pays model in other sectors of the ratings market, they do not allow the issuing banks to have such unprecedented and inappropriate influence over the ratings process in these other sectors. The fact that the CRAs allowed the banks to influence the ratings process so substantially (and ultimately to influence the final ratings) served as the ultimate compromise of the CRAs' integrity and triggered the deception at the heart of this case – that the CRAs' promises of independence, objectivity and competence were tainted by the inappropriate influence of the banks and the CRAs' greed.

44.    In the words of a former CRA managing director, Defendants engaged in a "market-share war where [ratings] criteria were relaxed" as the Defendants pursued profits over independence and objectivity. This battle for market share encouraged each Defendant to relax its respective standards in order to supply issuers with the ratings that they desired. In the words of a former Moody's managing director, Jerome Fons, "a large part of the blame" for this misconduct stemmed from the abuse of the Issuer Pays model. In his view, "[a] drive to maintain or expand market share made the rating agencies willing participants in this [ratings] shopping spree. It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency."

45.    In 2007, a former Moody's managing director, who later became a high-ranking S&P managing director, testified before Congress that:

- 26 -

> rating agencies can come under pressure to loosen their
> standards for a whole sector.  And this can happen from a
> behavior by the issuers called rating shopping, where . . . an
> issuer . . . shows a deal to multiple rating agencies and then
> picks one or two that have the easiest standards to rate the
> deal.   Then the other rating agencies that had tougher
> standards become invisible, and, once more, they don't
> make any money, because the way you make money . . . is
> you rate the deal and charge the issuer.  So it puts pressure
> on the rating agencies to loosen their standards. . . .

46.     The "fox-guarding-the-henhouse" nature of the Issuer Pays model – as financial

law expert, Professor John Coffee, labeled it in his Congressional testimony – created an

unconscionable situation where the CRA was "a watchdog paid by the person[] they are to

watch."  In the words of S&P executive Michael Gutierrez, the CRAs "bec[a]me so beholden to

their top issuers for revenue they . . . all developed a kind of Stockholm syndrome which they

mistakenly tag[ged] as Customer Value creation . . ."

47.     As a former Moody's Vice President described it:  "[t]he story at Moody's

doesn't start in 2007; it starts in 2000. This was a systematic and aggressive strategy to replace a

culture that was very conservative, an accuracy and quality oriented (culture), a getting-the-

rating-right kind of culture, with a culture that was supposed to be 'business-friendly,' but was

consistently less likely to assign a rating that was tougher than our competitors." Moody's CEO

Raymond McDaniel confirmed these facts in an October 2007 presentation to Moody's Board of

Directors, but (tellingly) not to the public:

> Ideally, competition would be primarily on the basis of
> ratings quality, with a second component of price and a third

> component of service.   Unfortunately, of the three competitive factors, rating quality is proving the least powerful . . . The real problem is not that the market does underweights [sic] ratings quality but rather that, in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the highest rating.

In a moment of prescience, Moody's CEO also stated to his own Board of Directors that, left "unchecked," this system "can place the entire financial system at risk."

48.     Author Richard Bitner, a 14-year veteran of the lending industry and author of "Confessions of a Subprime Lender: An Insider's Tale of Greed, Fraud, and Ignorance," opined that "the focus was on feeding the securitization machine and driving profits," and as a result, "no one was paying attention to the basic fundamental principles of risk management." Instead, "[w]hen an investment bank ha[d] a security filled with garbage loans, the [CRAs] advise them how to structure the deals in order to maximize profit."

49.     Richard Michalek, a former Moody's vice president and senior credit officer, agreed that the push for revenues and market share undermined the integrity of Moody's operations: "[T]he threat of losing business to a competitor rating agency, even if not realized, absolutely tilted the balance away from the independent arbiter of risk towards captive facilitator of risk transfer."

50.     A former S&P executive, Kai Gilkes, acknowledged that the incentive to match a competitor's credit enhancement was intense, because failing to match meant losing the deal. As a result of the pressure to move forward with the deal, "the line in the sand shifts and shifts,

- 28 -

and can shift quite a bit."  A former managing director at Moody's, Gary Witt, testified that banks regularly threatened to take their business elsewhere if the CRAs didn't meet their demands for a certain outcome: "It's like . . . 'Well, next time, we're just going to go with Fitch and S&P.'"  Thus, "rating shopping" – the practice whereby an issuer offers its business to the CRA that agrees to the most desirable rating – also polluted the integrity of Defendants' analysis for market share and other CRAs' willingness to give the security the issuer's desired rating.

51.     Defendants were keenly aware of how their competitors were handling ratings. As the former Moody's CEO described in 2007: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts. Everything was [designated] investment grade. It didn't really matter." Moody's decided it could only survive by playing the same game – publishing high ratings for lower-quality securities

52.     In contrast to their publicly advertised independence and objectivity, Defendants internally conceded that the investment banks' ratings shopping and volume of business had a major impact on the rating process.  In October 2007, Moody's CEO stated to his Board of Directors: "Analysts and [managing directors] are continually 'pitched' by bankers, issuers, investors . . . whose views can color credit judgment, sometimes improving it, other times degrading it (we 'drink the kool-aid'). Coupled with strong internal emphasis on market share & margin focus, this does constitute a 'risk' to ratings quality."

53.     Despite Defendants' private awareness that these dynamics were "color[ing] credit judgment" and that CRAs were "being bullied into caving in to bank pressure," Moody's

- 29 -

and S&P's public filings, Codes of Conduct and other promises stated precisely the opposite. As one Moody's manager with responsibility for rating structured finance securities bluntly told his staff, "I will be fired it we lose out on a single deal."

54.     Defendants' conduct had far-reaching and disastrous effects for the entire financial industry. According to Joseph Stiglitz, a Nobel Laureate and professor of economics at Columbia University, Defendants were "key culprits" in the housing crisis. The CRAs "were the part[ies] that performed that alchemy that converted the securities from F-rated to A-rated. The banks could not have done what they did without the complicity of the ratings agencies."

**B.      The Opacity and Complexity Inherent to Structured Finance Securities Made the Ratings Process Inaccessible to Mississippi Investors, Regulators and Consumers**

55.     Defendants knew that consumers, investors and regulators could not replicate the CRAs' analytical process. To do so would require: (1) access to the same data available to the CRAs and issuers (only the CRAs and issuers had access to the full complement of data); (2) access to all of the same analytical models the CRAs used to analyze the underlying data (although some models were made available for free, others were not available to the public or were prohibitively expensive; and it would be impossible for most investors, regulators and consumers to create their own analytical model); (3) substantial, expert resources necessary to apply the analytical model to the data (CRAs and issuers employ entire departments of highly specialized and expensive mathematicians and statisticians for this purpose, and these kinds of resources are well beyond the reach of government regulator budgets or pension fund managers);

- 30 -

and (4) access to the negotiations between the CRAs and the issuers about how to adjust parameters and data to achieve the desired rating result (these are highly confidential discussions that go to the heart of the Issuer Pays conflict, so the CRAs and issuers would never release this information to the public).

56.     As author and industry veteran Richard Bittner explained, "[t]he security gets spliced and diced into a hodgepodge of separate investment vehicles [including CDOs] . . . all of which represent different ways to distribute credit risk. The security gets diluted even further as some CDOs are backed by other CDOs, which can then invest again in other CDOs. . . . Since the original mortgages are no longer recognizable, judging the quality of the assets is next to impossible. Think of it this way: Imagine taking 10 different vegetables and pureeing them in a food processor until you have something close to soup. Ask someone to identify the ingredients but don't let him taste it—make him rely strictly on his sense of sight."

57.     Bittner notes that "[i]nvestors who buy these securities face the same challenge. Many believe the confusing nature of the investments means the fund managers who purchased them had no clue what they were buying. For this reason, the ratings agencies are vital to the process.     Without their objective analysis, investors wouldn't be able to recognize the risk associated with purchasing the securities."

58.     Despite this reality, the CRAs continued to misrepresent the complexity and inaccessibility of the structured finance ratings process. In fact, from at least 2005 through 2011, Moody's disclaimers advertised that users of the ratings service could, and in fact "must"

- 31 -

undertake their own analysis of the security.  From at least 2005 through present, disclaimers accompanying Moody's public press releases announcing new ratings or ratings adjustments stated that "each such user *must accordingly make its own study* and evaluation of each security . . . that it may consider purchasing, holding or selling." (Emphasis added.)  Consistent with this suggestion that complex securities like RMBS and CDOs can and should be analyzed by each of its customers, S&P's 2007 downgrade press releases instructed users that they "should not rely on any credit rating" provided by S&P.

59.     At the same time, the press releases also emphasized the quality and independence of Defendants' business model and ratings services.  S&P's 2007 press release advertised the company as "the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research and data," one that has "played a leading role for more than 140 years in providing investors with the independent benchmarks they need to feel more confident about their investment and financial decisions."  Moody's press releases promise that the company "maintain[s] policies and procedures to address the independence of [its] ratings and ratings processes."

60.     The desired impact of these disclaimers and promises was twofold.  First, the CRAs falsely assured consumers, investors and regulators that their business model was free from outside influence and impropriety, and encouraged users to have confidence in the integrity of the services offered.  Then, the CRAs told consumers, investors and regulators that they should verify the ratings analysis by conducting their own analysis.  The mixed message

- 32 -

generated confusion, as Congresswoman Eleanor Holmes Norton observed in a hearing before the Committee on Oversight and Government Reform: "On the one hand, the legal disclaimers saying people shouldn't rely on what you say because it's your opinion, they can't possibly be accurate or inaccurate. On the other hand, you are telling investors and they are paying because they believe you . . . that you have the best methodology and the best rating record and the most expertise, so they should pay you billions of dollars. And they comply." This implied both that the CRAs themselves were competent to provide the ratings services offered *and* that consumers, investors and regulators could somehow verify the accuracy and integrity of the CRAs' product by conducting their own analysis. Thus, the CRAs falsely advertised their own competence as well as the transparency and accessibility of their analytical process.

61.     Experts agreed that the complexity of the models and lack of accessible data rendered even the most sophisticated investors and regulators unable to assess the risk attached to complicated securities, especially CDOs. As Professor Coffee testified before the Senate Banking Committee in 2007, "[s]tructured finance particularly relies on the credit-rating agency because investors have no ability to evaluate on their own the securitized pools of financial assets that structured finance creates." That same year, Drexel University's Joseph Mason agreed with this position in his remarks before the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises: "While the statistical techniques used by the [CRAs] are transparent, the ratings criteria (the variables incorporated into the statistical techniques) are not disclosed up to a level of replicability. Without disclosure, even to a regulatory authority,

- 33 -

NRSRO models are black boxes. Hence, it came as a surprise when Moody's revealed that their ratings models lacked many key variables needed to properly evaluate non-prime loan products."

62.     Kevin Fry, as chairman of the Invested Asset Working Group of the National Association of Insurance Commissioners, said: "As regulators, we just have to trust that rating agencies are going to monitor CDOs and find the subprime[.] . . . We can't get there. We don't have the resources to get our arms around it."   Similarly, as the Financial Crisis Inquiry Commission concluded in its exhaustive study, "[m]any investors, such as some pension funds and university endowments, relied on credit ratings because they had neither access to the same data as the rating agencies nor the capacity or analytical ability to assess the securities they were purchasing."

63.     Federal Reserve Chairman Ben Bernanke explained in his September 2, 2010 testimony to the FCIC that:

> Rating agencies' ratings of asset-backed securities were revealed to be subject to conflicts of interest and faulty models.  At the end of the chain were investors that often relied mainly on ratings.  Even if the end-investors wanted to do their own credit analysis, the information needed to do so was often difficult or impossible to obtain.

64.     The underlying data needed to assess the creditworthiness of the securities is not available to the general public.  As Moody's former Managing Director, Jerome Fons, acknowledged, "subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. . . . Loan-by-loan data, the

- 34 -

highest level of detail, is generally not available to investors."

65.     Mississippi consumers, investors and government regulators relied on Moody's and S&P's representations that they provided services that were impartial, independent and of the highest quality available.  Defendants made those promises so that consumers, investors and regulators would also rely on their ratings.  At the end of the day, the promises did not accurately represent the CRAs' business model.  Defendants occupied a position of public trust, which they abused in the name of profits.

**C.    The Decision to Rate Increasingly Exotic Securities Compromised the Truthfulness of CRAs' Advertised Competence**

66.     As noted above, the Issuer Pays model produced conflicts of interest that led Defendants to rate any deal, no matter how complex, how little data was available, or how inadequate their models were for capturing the risk presented.  Despite the fact that the CRAs knew their analytical models could not assess the most complex securities with accuracy, they continued to rate these exotic products.  Their decision to continue in this manner turned their overt and implicit promises of competence into deceptions.

67.     S&P's experience with rating RMBS in the early 2000s is a telling example.  To rate RMBS, S&P traditionally had used a statistical modeling program, called "LEVELs," to estimate the likelihood of default and expected loss associated with the collateral in a loan pool of residential mortgages.  When LEVELs was implemented and published in 1996, S&P's intention was to continue to refine the program to enhance the reliability of the data that would

- 35 -

ultimately be used to determine the appropriate rating for RMBS. One such refinement occurred in 1999, when S&P incorporated data going back six to eight years for more than 900,000 residential mortgages.

68.     Tellingly, a refined LEVELs model that incorporated data for approximately 2.5 million residential mortgages was developed in 2001, and a further revised LEVELs model was created in 2004 with data from approximately 9.5 million residential mortgages – but S&P chose not to implement either revised model, instead continuing to use the outdated (and incompetent) model. A former S&P senior managing director confirmed in testimony before Congress that S&P maintained a trove of residential mortgage data, but, as late as October 2008, failed to use it to refine LEVELs. Between 2001 and 2008, S&P chose again and again to use an outdated version of its LEVELs model for RMBS collateral, a decision motivated by the company's desire to keep its issuer clients happy through the continued assignment of AAA ratings to RMBS.

69.     The willingness to apply an outdated model compromised S&P's ability to perform its basic function: to assess the risk of the securities it was paid to rate. As the former managing director concluded in his Congressional testimony, "[a]s a result, *we didn't have the data going forward in 2004 and 2005 to really track what was happening with the subprime products and some of the new alternative-payment type products. And we did not, therefore, have the ability to forecast when they started to go awry.*" (Emphasis added.) In his opinion, "had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses."

- 36 -

70.     Defendants' claims of competence were particularly deceptive with respect to CDOs, where the ratings process is even more complex.  Ratings for CDOs often are not based on the actual pool of loans, but rather on agreed-upon limits for each type of potential asset that could be in the pool.  This makes rating such products more speculative because the analyst can make, at best, an educated guess about what the actual composition of the loan pool collateral he or she is rating will be.  Nevertheless, CRAs continued to provide CDOs with ratings as high as the ratings they gave to large, financially sound corporations.  As Richard Bitner wrote: "To claim a subprime CDO carries the same risk as bonds issued by the most financially sound corporations is not only mind-boggling, it's negligent."  CRAs nonetheless routinely rated CDOs triple-A.

71.     On the CDO front, S&P violated its internal policies by rating certain CDOs without analyzing the underlying data, another sign that S&P knew it was providing a service that it was not competent to provide.  For example, in connection with its efforts to rate a certain CDO in 2001, the issuer structured the CDO using an RMBS that another agency had rated.  Pursuant to its internal rules, S&P should have independently examined the loan data underlying that RMBS before providing an estimate for the CDO that relied on those RMBS.  However, the head of S&P's CDO group and member of the Executive Committee responded to a request from a managing director for actual loan-level data for the RMBS by calling the request "TOTALLY UNREASONABLE!!"  The managing director was told to "devise some method" for providing the credit estimates, even without information on the underlying loan levels, flouting internal

- 37 -

S&P procedures that required analysts to obtain appropriate data before carrying out a credit analysis. Significant portions of the CDO received a AAA rating for the credit estimate, despite the fact that the managing director in charge of rating the deal was essentially asked to "provide a guess" as to the appropriate rating. And in direct response to requests that CDO ratings requirements be lessened to maintain market share in 2004, the head of S&P's CDO unit and member of the company's Executive Committee endorsed lessening ratings standards by noting: "OK with me to revise criteria."

72.     Moody's also misrepresented its competence to rate these complex securities. A senior managing director at Moody's urged the company to "not rate [asset backed securities] CDOs" because the "complexity of the product and multiple layers of risk" render it "NEVER possible to have the requisite amount of information to rate." Nevertheless, Moody's continued to rate the CDOs.

73.     Moody's had become increasingly "desperate to generate revenue," leading to "the approval and rating of more complex and highly questionable transactions." Indeed, Moody's even allowed the banks to control the pace and volume of ratings. Where a CRA had taken six to eight weeks to rate a CDO before the housing boom, by 2006 Moody's gave an AAA rating to an average of 30 mortgage securities per business day. According to Eric Kolchinsky, a former managing director, executives at Moody's failed to provide him with the necessary staff to update risk models or perform analysis on complex structured finance securities; understaffed and overwhelmed by issuer pressure, "[e]ach deal was a crisis." By May of that year, an internal

- 38 -

Moody's email would prove the managing director right, referring to Moody's ABS CDO ratings as "the biggest credit risk management failure ever."

74.    Instead of informing the public about this risk or limiting the CDOs it rated, S&P continued to conduct "business as usual" – as if rating these exotic CDOs fell within the CRA's core competence.  As an S&P employee noted, "[r]ating agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters. 😑 "

75.    As one former managing director at Moody's stated, "a lot of people just should have said no to some of these products. And that is 20/20 hindsight, but I think that is the major part, to have just said, we can't analyze this with any degree of confidence and we should just walk away from it. But that was just not possible[,]" because the fear of losing market share or revenue superseded any sense of obligation to provide the independent, objective and competent services the CRAs so proudly advertised.

76.    An Instant Message between two S&P officials who worked in the Structured Finance (CDO) division reflects an example of the deterioration of the CRAs' competence and independence:

> Analyst 1: "btw – that deal is ridiculous"
> Analyst 2: "I know right . . . model def does not capture half of the rish...risk"
> Analyst 1: "we should not be rating it"
> Analyst 2: "we rate every deal . . . *it could be structured by cows and we would rate it*"
> Analyst 1: "But there's a lot of risk associated with it – I personally

- 39 -

don't feel comfy signing off as a committee member."

(Emphasis added).  According to the SEC, S&P nonetheless rated the deal.

77.    By continuing to assign credit ratings to these extremely complex financial securities, Moody's and S&P knowingly catered to the demands of investment banks, focusing on profits instead of adhering to longstanding and public assurances of objectivity, independence and competence.  The ultimate result was that Moody's and S&P gave their bank clientele what they wanted – the best ratings that money could buy, at the expense of Mississippi consumers, regulators and investors.  If Moody's and S&P had not given their Good Housekeeping Seal of Approval to these risky and poorly analyzed investments, the issuers of these securities could not have sold them to investors and others.  The people of Mississippi were misled into believing that the CRAs' analysis was independent, objective and competent when it was nothing more than a siren song penned to sooth the ears of big investment banks, while at the same time causing devastating harm to Mississippi investors and consumers.  Moody's and S&P issued the investment grade ratings that made RMBS and CDOs seem like safe investments, helping to build an active market for these securities.  Furthermore, after the mass downgrades in July 2007, the value of these securities plummeted, precipitating first the collapse of the RMBS and CDO markets and second the collapse of the overall economy.  More than any other players in the financial crisis, the role that Moody's and S&P played had a more significant impact that triggered the nationwide economic meltdown.

- 40 -

## VII.   CAUSES OF ACTION

**FIRST COUNT**
**Violation of the Mississippi Consumer Protection Act,**
Miss. Code Ann. § 75-24-1, *et seq.*

78.      Plaintiff realleges and incorporates herein by reference the preceding allegations of this Complaint.

79.      At all times relevant to this Complaint, S&P and Moody's were engaged in the trade or commerce of providing credit ratings for use by market participants, regulators and investors within the State of Mississippi.

80.      By engaging in the acts and practices alleged herein, S&P and Moody's made or caused to be made to Mississippi consumers, directly or indirectly, representations which are material, reasonably interpreted, false and likely to mislead in violation of Miss. Code Ann. § 75-24-5.  Specifically, Miss. Code Ann. § 75-24-5 prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics . . . that they do not have . . ." and "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . ." and "[m]isrepresentation of the source, sponsorship, approval, or certification of goods or services" and "[m]isrepresentation of affiliation, connection, or association with, or certification by another." *See* Miss. Code Ann. §§ 75-24-5 (2) (b), (c), (e) and (g).  Moody's and S&P's false, misleading and deceptive representations include, but are not limited to, the following:

A.      Moody's and S&P misrepresented that they dealt fairly and honestly with

- 41 -

Mississippi consumers, government regulators, investors or other market participants;

B.     Moody's and S&P misrepresented that their business models were independent, objective and free of influence from investment banks and the desire for increased market share and revenue;

C.     Moody's and S&P misrepresented their competence to provide expert analysis of certain structured finance products;

D.     Moody's and S&P misrepresented that they operated their businesses in conformance with their respective Codes of Conduct and the principles set forth in the IOSCO Code;

81.     Mississippi consumers, investors, government regulators and other members of the financial marketplace viewed Defendants' misrepresentations.

82.     Moody's and S&P's unfair and deceptive business practices as alleged herein directly and proximately caused substantial injury to consumers within the State of Mississippi in the form of deceiving the banks, insurance companies, government regulators, mutual funds and pension funds, which relied on these assurances when deciding to purchase certain securities.

83.     Moody's and S&P knew or should have known that the conduct alleged herein violated Miss. Code Ann. § 75-24-5 and that their acts and practices alleged herein constitute unfair and deceptive trade practices as they are defined in said statute.

**SECOND COUNT**
**Injunctive Relief**
**Miss. Code Ann. § 75-24-9**

- 42 -

84.     Plaintiff re-alleges and incorporates herein by reference the foregoing allegations of this Complaint.

85.     Plaintiff herein seeks injunctive relief pursuant to Miss. Code Ann. § 75-24-9 enjoining S&P and Moody's from engaging in any acts that violate the Mississippi Consumer Protection Act, including, but not limited to the deceptive or unfair trade practices alleged herein.

**THIRD COUNT**
**Disgorgement/Unjust Enrichment**

86.     Plaintiff re-alleges and incorporates herein by reference the foregoing allegations of this Complaint.

87.     Defendants have been unjustly enriched – in the form of increased revenues and profits – as a result of their misrepresentations of independence, objectivity and competence, in violation of the laws of the State of Mississippi.  This civil action is founded on principles of equity and is brought under the common law and Mississippi law to recover for damages, and for such other relief as equitably may be obtained, for the harms intentionally and wrongfully done to the State by the Defendants, who have been and continue to be unjustly enriched.  Due to this unjust enrichment, the Defendants should be required by this Court to submit to an accounting and to disgorge any profits that were obtained as a result of said misrepresentations.

**PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Attorney General Jim Hood on behalf of the State of Mississippi, requests the following relief from this Honorable Court:

- 43 -

88.     A finding by the Court that, by the acts alleged herein, Moody's and S&P engaged in unfair and deceptive business acts and practices in the course of engaging in the trade or commerce of a credit rating agency within the State of Mississippi in violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

89.     An injunction pursuant to Miss. Code Ann. § 75-24-9 enjoining Moody's and S&P from engaging in any acts that violate the Mississippi Consumer Protection Act, including, but not limited to, the unfair and deceptive acts and practices alleged herein;

90.     An order requiring that Moody's and S&P submit to an accounting to determine the amount of improper fees and revenue paid to Moody's and S&P as a result of their unfair and deceptive trade practices and acts and disgorge those ill-gotten gains;

91.     An order pursuant to Miss. Code Ann. § 75-24-19(1)(b) directing Moody's and S&P to pay a civil penalty not to exceed Ten Thousand Dollars ($10,000.00) for each and every violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-5;

92.     An order directing Moody's & S&P to pay attorneys' fees and costs of this action;

93.     An order directing Moody's & S&P to pay punitive damages; and

94.     Such other relief as this Court deems just and equitable in the premises.

DATED this ___ day of May, 2011.

**PLAINTIFF, STATE OF MISSISSIPPI, et rel.
JIM HOOD, ATTORNEY GENERAL**

- 44 -

By: _____

Geoffrey Morgan MSB No. 3474
George W. Neville MSB No. 3822
Meredith M. Aldridge MSB No. 100696
Special Assistant Attorneys General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205
Phone/Fax 601-359-3680 / 601-359-2003
Email: gnevi@ago.state.ms.us, gmorg@ago.state.ms.us
        maldr@ago.state.ms.us

Blake A. Tyler (MSB No. 101786)
775 East Fortification Street
Jackson, Mississippi 39202
Phone/Fax: 601 949 5000 / 601 510 9089
Email: btyler@pgtlaw.com

Vaterria Martin (MSB No. 101235)
5709 Highway 80 West
Jackson, Mississippi 39209
Phone/Fax: 601 923 1577/ 601 923 1579
Email: vmmartin@4martinsatlaw.com


COUNSEL FOR THE STATE OF MISSISSIPPI

- 45 -

IN THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT
OF HINDS COUNTY, MISSISSIPPI

Attorney General Jim Hood, *ex rel.*
State of Mississippi,

        Plaintiff

      vs.                     Civil Action No.: __G2011-835__
                                                 5/2

The McGraw-Hill Companies, Inc.,
Standard & Poor's Financial Services, LLC,
Moody's Corporation and Moody's Investors Service, Inc.,

        Defendants

**STATE OF MISSISSIPPI**

**TO:**    **Moody's Corporation**
        **7 World Trade Center**
        **250 Greenwich Street**
        **New York, NY 10007**

THE COMPLAINT ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU HAVE BEEN MADE A DEFENDANT IN A COMPLAINT FILED IN THIS COURT BY THE PLAINTIFF. You are hereby required to mail or hand deliver a copy of a written response to the Complaint to Blake A. Tyler, attorney for plaintiff, whose address is 775 East Fortification Street, Jackson, Mississippi 39202. Your response must be mailed or delivered within thirty (30) days from the date of delivery of this summons and complaint or a judgment by default may be entered against you for the money or other things demanded in the complaint. You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

ISSUED UNDER MY HAND, this the _10th_ day of May, 2011.

EDDIE JEAN CARR, CHANCERY CLERK
P.O. BOX 686
JACKSON, MS 39205

BY: _____
       **DEPUTY CLERK**