**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE:  Rating Agency Litigations | MDL No. |

**MEMORANDUM OF LAW IN SUPPORT OF MOVANTS' MOTION TO
TRANSFER ACTIONS FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407**

Floyd Abrams
Susan Buckley
Adam Zurofsky
Jason Hall
CAHILL GORDON & REINDEL LLP
Office and P.O. Address:
80 Pine Street
New York, New York 10005-1772
(212) 701-3000

*Attorneys for the Movants*

Exhibit 1

## TABLE OF CONTENTS

*page*

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND

    The State Actions ..............................................................................................4

    The Declaratory Judgment Actions ................................................................10

ARGUMENT

    A.   The actions involve numerous common questions of fact. ......................... 11

    B.   Transfer will promote convenience for the parties and witnesses and advance the just and efficient conduct of the actions..................................... 12

    C.   There is no articulable prejudice to the Attorneys General. ..................... 13

    D.   The Actions should be transferred to the Southern District of New York. ........................................................................................................... 14

CONCLUSION ................................................................................................... 17

Exhibit 1

<u>**TABLE OF AUTHORITIES**</u>

<u>*PAGE*</u>

<u>**CASES**</u>

*In re Air Crash Near Kirksville, Missouri, on October 19, 2004,*
  383 F. Supp. 2d 1382 (J.P.M.L. 2005)...................................................................16

*Albert Fadem Trust* v. *Duke Energy Corp.,*
  214 F. Supp. 2d 341 (S.D.N.Y. 2002)...................................................................16

*In re AOL Time Warner, Inc.,*
  235 F. Supp. 2d 1380 (J.P.M.L. 2002)...................................................................16

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash,*
  No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012).............................2, 15

*In re Capital One Bank Credit Card Terms Litigation,*
  201 F. Supp. 2d 1377 (J.P.M.L. 2002)...................................................................11

*In re: Coloplast Corp. Pelvic Support System Products Liability Litigation,*
  883 F. Supp. 2d 1348 (Aug. 6, 2012)......................................................................13

*Compuware Corp.* v. *Moody's Investors Services, Inc.,*
  499 F.3d 520 (6th Cir. 2007) ...............................................................................2, 10

*In re: Countrywide Financial Corp. Mortgage Marketing and Sales Practices*
  *Litigation,* 582 F. Supp. 2d 1373 (J.P.M.L. 2008)................................................14

*In re Cygnus Telecommunications Technology, LLC, Patent Litigation,*
  177 F. Supp. 2d 1375 (J.P.M.L. 2001)...................................................................13

*In re Department of Veterans Affairs (VA) Data Theft Litigation,*
  461 F. Supp. 2d 1367 (J.P.M.L. 2006)...................................................................16

*In re First National Bank, Heavener, Okl. (First Mortgage Revenue Bonds)*
  *Securities Litigation,* 451 F. Supp. 995 (J.P.M.L. 1978)......................................12

*In re: Foot Locker, Inc.,*
  787 F. Supp. 2d 1364(J.P.M.L. 2011).....................................................................13

*Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing,*
  545 U.S. 308 (2005)...................................................................................................6

*Jefferson County Sch. Dist. No. R-1* v. *Moody's Investor's Services, Inc.,*
  175 F.3d 848 (10th Cir. 1999) ..............................................................................2, 10

Exhibit 1

ii

*In re Lehman Brothers Mortgage-Backed Securities Litigation*,
650 F.3d 167 (2d Cir. 2011).................................................................................16

*In re Lehman Brothers Securities & ERISA Litigation*,
681 F. Supp. 2d 495 (2010) .................................................................................15

*In re: Maxim Integrated Products, Inc., Patent Litigation*,
867 F. Supp. 2d 1333 (J.P.M.L. 2012).................................................................16

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*,
547 US 71 (2006)....................................................................................................3

*In re MLR, LLC, Patent Litigation*,
269 F. Supp. 2d 1380 (J.P.M.L. 2003).................................................................13

*In re Operation of Missouri River System Litigation*,
277 F. Supp. 2d 1378 (J.P.M.L. 2003).................................................................12

*In re Pharmastem Therapeutics, Inc., Patent Litigation*,
360 F. Supp. 2d 1362 (J.P.M.L. 2005).................................................................15

*Reese* v. *The McGraw-Hill Cos., Inc., et al.*,
No. 08 Civ. 7202 (SHS) (S.D.N.Y. Mar. 30, 2012).............................................15

*In re: Royal Alliance Associates, Inc., Securities Litigation*,
856 F. Supp. 2d 1339 (J.P.M.L. 2012).................................................................13

*In re: Skelaxin (Metaxalone) Antitrust Litigation*,
856 F. Supp. 2d 1350 (J.P.M.L. 2012).................................................................11

*In re Southeast Properties Ltd. Partnership Investor Litigation*,
796 F. Supp. 538 (J.P.M.L. 1992)........................................................................16

*In re Terminix Employment Practices Litigation*,
466 F. Supp. 2d 1354 (J.P.M.L. 2006).................................................................12

*In re: Tribune Co. Fraudulent Conveyance Litigation*,
831 F. Supp. 2d 1371 (Dec. 19, 2011).................................................................13

*Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*,
283 F.R.D. 199, 218 (S.D.N.Y. 2012)..................................................................16

*In re Wireless Telephone Services Antitrust Litigation*,
249 F. Supp. 2d 1379 (J.P.M.L. 2003).................................................................12

*In re: Zurn Pex Plumbing Products Liability Litigation*,
572 F. Supp. 2d 1380 (J.P.M.L. 2008).................................................................11

Exhibit 1

iii

## STATUTES

15 U.S.C. § 78o-7(a)(1)(B)(viii) ..............................................................................7

15 U.S.C. § 78o-7(c)(1) ...........................................................................................4

15 U.S.C. § 78o-7(c)(2) ........................................................................................4, 8

28 U.S.C. § 1407 ...............................................................................................11, 16

Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327
    (Sept. 29, 2006) .................................................................................................3, 4

## OTHER AUTHORITIES

Oversight of Credit Rating Agencies Registered as NRSROs, Credit Rating
    Agency Reform Act of 2006 Release No. 34-55857, 72 Fed. Reg. 33,564,
    33,564 (June 5, 2007)........................................................................................3

*Press Conference with Attorney General Eric Holder, Associate Attorney General
    Tony West, Deputy Assistant Attorney General Stuart Delery, Announcement
    of a Major Financial Fraud Enforcement Action, Washington, D.C.* (Feb. 5,
    2013) .................................................................................................................9, 10

*The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets:
    Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th
    Cong. 16 (Sept. 26, 2007) (statement of Christopher Cox, Chairman, SEC) ..........................4

U.S. Department of Justice, Department of Justice Sues Standard & Poor's for
    Fraud in Rating Mortgage-Backed Securities in the Years Leading Up to the
    Financial Crisis (Feb. 5, 2013)..........................................................................6

Exhibit 1

## PRELIMINARY STATEMENT

The McGraw-Hill Companies, Inc. and Standard & Poor's Financial Services LLC (collectively, "S&P" or "Movants") respectfully submit this memorandum and the accompanying Declaration of Adam Zurofsky in support of their Motion To Transfer Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407.

This motion, brought in respect of a series of coordinated actions initiated by the Attorneys General of nearly twenty states (the "State Actions"),[1] presents an ideal model for centralization. Each action asserts the same basic legal theory based on the same, if not absolutely identical, factual allegations. Taken as a whole, the actions represent a concerted effort to undermine, if not supplant, a detailed, comprehensive, and carefully balanced federal scheme through patchwork and inevitably conflicting rulings across the country. These nominally separate actions — the vast majority of which were filed on the same day and touted as the result of a "coordinated" effort at a joint press conference held by several of the Attorneys General to announce their filing — are, in effect, a single hindsight-infused attempt by the states to lay blame with S&P for failing to predict the financial crisis and they should be treated collectively.

As demonstrated in Point A, *infra*, to state that common issues of fact exist among these cases is an understatement of gross proportions. Not only is each of the State Actions brought under the same basic theory — that S&P's representations about its "independence" and "objectivity" were rendered false in light of a conflict of interest that affected the ratings it issued on certain structured finance products — but the basic allegations themselves overlap among the actions, often word-for-word. For example, a comparison of the allegations across each of the State Actions for which consolidation is sought reveals over 100 allegations that are found in

---

[1] As described *infra*, consolidation is also sought of two declaratory judgment actions brought by S&P in South Carolina and Tennessee related to the same issues as the State Actions brought in those two states.

Exhibit 1

2

substantially similar, if not identical, form in more than three-fourths of the complaints. Litigating the actions separately would involve the wholly inefficient exercise of virtually identical motion practice, discovery (and discovery disputes) in seventeen different venues.

Centralization will also conserve judicial resources and, equally, if not more importantly, promote judicial consistency. *See* Point B, *infra*. At their core, each State Action will require pretrial rulings on a host of critical and virtually identical legal issues, including: (i) whether the alleged misstatements that each of the State Actions purports to be based upon — S&P's public statements that its ratings process is and was "independent" and "objective" — are in fact actionable as a matter of law, *see Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012) (holding the same statements at issue in these cases to be nonactionable as a matter of law); (ii) the scope and impact on the actions of the broad federal regulatory regime relating to and overseeing the securities industry generally and credit rating agencies such as S&P in particular; and (iii) the application in each case of the First Amendment, which has repeatedly been held to apply to credit ratings opinions such as those issued by S&P, *see, e.g.*, *Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007); *Jefferson County Sch. Dist. No. R-1* v. *Moody's Investor's Services, Inc.*, 175 F.3d 848, 856 (10th Cir. 1999). Consistency is of particular importance in this instance since credit ratings exist on a national (even an international) basis and the prospect of inconsistent legal standards across the states could undermine the efficient operations of the financial markets nationwide. Nor would consolidation result in any cognizable prejudice to the states. *See* Point C, *infra*.

For all these reasons, Movants respectfully submit that the actions are ideally suited to centralization and should be transferred for coordinated pretrial proceedings.

Exhibit 1

3

**BACKGROUND**

S&P is the world's largest credit rating agency and a Nationally Recognized Statistical Rating Organization ("NRSRO") registered with the United States Securities and Exchange Commission ("SEC"). S&P's credit ratings are broadly published forward-looking opinions about the creditworthiness of issuers of debt, from sovereign countries such as the United States, to corporations, to structured finance securities such as mortgage-backed securities. NRSROs and the ratings opinions that they issue are integral components of the broader federal financial regulatory scheme. *See* Oversight of Credit Rating Agencies Registered as NRSROs, Credit Rating Agency Reform Act of 2006 Release No. 34-55857, 72 Fed. Reg. 33,564, 33,564 (June 5, 2007) ("The term *nationally recognized statistical rating organization* ('NRSRO') is used in federal and state statutes and regulations to confer regulatory benefits or prescribe requirements based on credit ratings issued by credit rating agencies identified as NRSROs." (emphasis in original)).

Given the national reach of ratings and their role in the financial markets, in 2006 Congress, acting pursuant to its Commerce Clause authority, enacted the Credit Rating Agency Reform Act of 2006 ("CRARA"), expressly finding that "credit rating agencies are of national importance" and that safeguarding the integrity of the ratings process from conflicts of interest was an important federal interest. Credit Rating Agency Reform Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327 (Sept. 29, 2006); *cf. Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 US 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."). Accordingly, CRARA included a variety of requirements related to the independence of the ratings process and delegated to the SEC "exclusive authority to enforce the provisions of this section in accordance with this chapter with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures re-

**Exhibit 1**

4

lating to the prevention of misuse of nonpublic information and **conflicts of interest**." 15 U.S.C. § 78o-7(c)(1) (emphasis added). In addition, because credit ratings are statements of opinion protected by the First Amendment, Congress further made clear that "neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings." *Id.* § 78o-7(c)(2). As the Chairman of the SEC at the time of CRARA's adoption, Christopher Cox, made clear in testimony before Congress at the time of its enactment, CRARA "struck a sound balance" in its delegation of "authority." *The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 16 (Sept. 26, 2007) (statement of Christopher Cox, Chairman, SEC).[2]

### The State Actions

The State Actions pose a threat to that "sound balance." At their core they seek to replace the carefully crafted federal regulatory regime with a patchwork of state measures, each of which would have the likely effect of becoming *de facto* national regulation since ratings are generated, published, and used on a national basis. Because questions concerning the permissible scope of state regulation in light of a comprehensive federal regulatory regime will play a critical role in pretrial proceedings, including motion practice and the scope of discovery, the value and importance of consistency across these cases is self-evident — it simply cannot be that different states across the country could have different powers in relation to the federal regulatory scheme.

As set forth in the accompanying schedule, the seventeen State Actions that S&P seeks to transfer are:

---

[2]     A true and correct copy of Chairman Cox's testimony is annexed to the Zurofsky Declaration as <u>Exhibit A</u>.

Exhibit 1

5

- *Arizona ex rel. Horne* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Arkansas ex rel. McDaniel* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Colorado ex rel. Suthers* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Connecticut* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Delaware* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *District of Columbia* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services LLC*
- *Idaho, ex rel. Wasden* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Illinois* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Iowa ex rel. Miller* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Maine* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Mississippi, ex rel. Hood* v. *The McGraw-Hill Companies, Inc., Standard & Poor's Financial Services, LLC, Moody's Corporation & Moody's Investors Service, Inc.*
- *Missouri, ex rel. Koster* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *North Carolina, ex rel. Cooper* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Pennsylvania ex rel. Kane* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *South Carolina, ex rel. Wilson* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Tennessee, ex rel. Cooper* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*
- *Washington* v. *The McGraw-Hill Companies, Inc. & Standard & Poor's Financial Services, LLC*[3]

---

[3]   A case brought by the State of California has not been included because it is related to a private

*Footnote continued on next page.*

Exhibit 1

6

Each was originally filed in state court. Most were filed on the same date, February 5, 2013, after a press conference held by U.S. Attorney General Eric Holder and the Attorneys General of several states.[4] Three were filed prior to that date; one, by South Carolina, was filed after it.[5]

      S&P removed each of the State Actions (with the exception of Mississippi, which was already pending in federal court) on March 6, 2013, because each involves disputed federal issues, including: whether the State Actions improperly usurp federal regulatory authority and restrain speech entitled to protection under the First Amendment to the Constitution. *See Grable & Sons Metal Products, Inc.* v. *Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005) (federal question present where plaintiff's state-law claims "necessarily raise a stated federal issue, actually disputed and substantial"). The actions are currently pending in separate federal district courts in eleven of the twelve federal circuits.

      As noted, each of the seventeen State Actions for which consolidation is sought is premised broadly on the same basic theory: that in alleged violation of state unfair trade practices and/or blue sky laws, S&P yielded to pressure from issuers of securities to assign higher credit ratings than it otherwise would have, thereby rendering "false" various statements S&P has made

---

*Footnote continued from previous page.*

      case seeking overlapping relief that is already being litigated in California state court. *See California Public Employees' Retirement System* v. *Moody's Investors Service, Inc.*, No. CGC-09-490241 (Cal. Super. Ct. San Francisco Cty. filed Jul. 9, 2009).

[4]    *See* U.S. Department of Justice, Department of Justice Sues Standard & Poor's for Fraud in Rating Mortgage-Backed Securities in the Years Leading Up to the Financial Crisis (Feb. 5, 2013), *available at* http://www.justice.gov/opa/pr/2013/February/13-ag-156.html. On the same day, the Department of Justice initiated a civil action against Movants which is currently pending before Judge David O. Carter in the Central District of California. *See United States* v. *The McGraw-Hill Companies, Inc.*, No. CV13-00779 (C.D. Ca. Feb. 4, 2013. Although largely based on the same factual allegations, that action differs from the State Actions in significant ways, notably by advancing claims on behalf of federally-insured banks under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").

[5]    On March 10, 2010, the Connecticut Attorney General filed an action in state court against Movants; that case is currently in discovery. The Mississippi Attorney General filed a civil action in state court on May 10, 2011, which is currently pending in the Southern District of Mississippi on the Attorney General's motion to remand. The Illinois Attorney General filed a civil action in state court on January 25, 2012; preliminary motions were terminated on November 7, 2012.

Exhibit 1

7

over the years about the independence of its credit ratings process.[6] Each alleges that S&P's methodology for rating certain structured finance securities was corrupted by a desire for increased revenue and market share resulting from the fact that S&P, like all of the major credit rating agencies, uses an "issuer pays" compensation model.[7]

The actions all seek essentially the same relief: some form of civil penalties, disgorgement and/or restitution on behalf of unidentified victims, and permanent injunctive relief aimed at regulating aspects of S&P's credit rating activities.[8] The requested injunctions are uniformly broad and intrusive, ranging from such orders as are "necessary to prevent [Movants'] continued or future deceptive or misleading trade practices or statements," Colorado Cplt., Prayer for Relief ¶ C, to orders "enjoin[ing] S&P from rating securities when it has a conflict and when it is not competent to give the rating," Maine Cplt., Relief Requested ¶ 4.[9] Such broad relief inherently conflicts with the comprehensive federal scheme which, among other things, (i) contemplates and permits (even if it regulates) the issuance of ratings by rating agencies that are paid by those they rate, *see* 15 U.S.C. § 78o-7(a)(1)(B)(viii); and (ii) expressly prohibits

---

[6] *See, e.g.,* Ariz. Cplt. ¶¶ 1, 11, 148; Ark. Cplt. ¶¶ 1, 11, 146; Conn. Cplt. ¶¶ 1, 11, 142; Colo. Cplt. ¶¶ 1, 11, 150; Del. Cplt. ¶¶ 1, 11, 150; D.C. Cplt. Intro. and ¶¶ 17, 163; Idaho Cplt. ¶¶ 17, 178; Ill. Cplt. ¶¶ 1, 11, 142; Iowa Cplt. ¶¶ 1, 11, 142; Me. Cplt. Intro. and ¶¶ 46, 38; Miss. Cplt. ¶¶ 1, 77; Mo. Cplt. ¶¶ 1, 26, 159; N.C. Cplt. ¶¶ 1, 10, 96; Pa. Cplt. ¶¶ 9, 66, 90; S.C. Cplt. ¶¶ 1, 17, 162; Tenn. Cplt. ¶¶ 4, 14, 203; Wash. Cplt. ¶¶ 1, 10, 139.

[7] *See, e.g.,* Ariz. Cplt. ¶¶ 57, 148, 167 ; Ark. Cplt. ¶¶ 56, 146, 167; Conn. Cplt. ¶¶ 63, 142, 145; Colo. Cplt. ¶¶ 150, 154; Del. Cplt. ¶¶ 57, 150, 185; D.C. Cplt. ¶¶ 56, 163, 167; Idaho Cplt. ¶¶ 75, 178, and Cause of Action II ¶ 6; Ill. Cplt. ¶¶ 142, 171; Iowa Cplt. ¶¶ 57, 142; Me. Cplt. ¶¶ 34, 46; Miss. Cplt. ¶¶ 40, 43, 80; Mo. Cplt. ¶¶ 67, 159, 198; N.C. Cplt. ¶¶ 44, 96, 115; Pa. Cplt. ¶¶ 60, 69, 80; S.C. Cplt. ¶¶ 56, 162, 166; Tenn. Cplt. ¶¶ 66, 203, 260b; Wash. Cplt. ¶¶ 52, 139, 145.

[8] *See, e.g.,* Ariz. Cplt. ¶ 12; Ark. Cplt. ¶ 12; Conn. Cplt. ¶ 12; Colo. Cplt. ¶ 12; Del. Cplt. ¶ 13 (cease and desist order); D.C. Cplt. Intro. ¶ 1; Idaho Cplt. ¶ 18; Ill. Cplt. ¶ 12; Iowa Cplt. ¶¶ 12, 14; Me. Cplt. Intro.; Miss. Cplt. ¶ 18; Mo. Cplt. ¶ 27; N.C. Cplt. ¶ 12; Pa. Cplt. Intro.; S.C. Cplt. Prayer for Relief ¶¶ 2-4, 7-12 ; Tenn. Cplt. ¶ 16; Wash. Cplt. Prayer for Relief ¶¶ 3-5.

[9] *See also* Ariz. Cplt. ¶ 12; Ark. Cplt. ¶ 12; Conn. Cplt. ¶ 12; Colo. Cplt. ¶ 12; Del. Cplt. ¶ 13 (cease and desist order); D.C. Cplt. Intro. & ¶ 1; Idaho Cplt. ¶ 18; Ill. Cplt. ¶ 12; Iowa Cplt. ¶¶ 12, 14; Me. Cplt. Intro.; Miss. Cplt. ¶ 18; Mo. Cplt. ¶ 27; N.C. Cplt. ¶ 12; Pa. Cplt. Intro.; S.C. Cplt. Prayer for Relief ¶¶ 2-4, 7-12; Tenn. Cplt. ¶ 16; Wash. Cplt. Prayer for Relief ¶¶ 3-5.

Exhibit 1

8

states from regulating the "substance" of ratings or the methodologies by which they are derived, *see id.* § 78o-7(c)(2).

A simple comparison of the allegations in each of the complaints in the State Actions demonstrates the breadth of their similarity. They all identify the same supposedly false statements made by S&P.[10] They all rely on the same documents and emails from the same S&P employees.[11] Many allege the same specific facts in support of their theory.[12] Indeed, many of

---

[10]    Statements on S&P's website: Ariz. Cplt. ¶ 64; Ark. Cplt. ¶ 63; Conn. Cplt. ¶ 70; Colo. Cplt. ¶ 56; Del. Cplt. ¶¶ 38, 170; D.C. Cplt. ¶ 63; Idaho Cplt. ¶ 83; Ill. Cplt. ¶ 52; Iowa Cplt. ¶ 64; Me. Cplt. ¶ 28; Miss. Cplt. ¶ 25(c)(ii); Mo. Cplt. ¶ 74; N.C. Cplt. ¶ 50; S.C. Cplt. ¶ 63; Tenn. Cplt. ¶¶ 73, 255; Wash. Cplt. ¶ 58.

Statements in Movants' Annual Report: Ariz. Cplt. ¶¶ 65-67, 82-83, 86; Ark. Cplt. ¶¶ 64-66, 81-82, 85; Conn. Cplt. ¶¶ 71-73, 87-88, 91; Colo. Cplt. ¶¶ 52, 54, 79-80, 84, 88, 90; Del. Cplt. ¶¶ 65-67, 82-83, 86; D.C. Cplt. ¶¶ 64-66, 82-83, 86; Idaho Cplt. ¶¶ 70, 84-85, 105-106, 109; Ill. Cplt. ¶¶ 53-55, 69-71; Iowa Cplt. ¶¶ 65, 77-78, 81; Me. Cplt. ¶ 25; Miss. Cplt. ¶¶ 25(a)(ii), 25(i)(a)(ii); Mo. Cplt. ¶¶ 75, 77-78, 93-94, 97, 100-102; Pa. Cplt. ¶ 50; S.C. Cplt. ¶¶ 64-67, 82-83, 86; Tenn. Cplt. ¶¶ 74-76, 92-93, 96, 241, 242-244; Wash. Cplt. ¶¶ 59-61, 76-77, 80.

Statements from the International Organization of Securities Commissions ("IOSCO") Code of Conduct: Ariz. Cplt. ¶¶ 71-73; Ark. Cplt. ¶¶ 70-71; Conn. Cplt. ¶¶ 76-78; Colo. Cplt. ¶¶ 69-71; Del. Cplt. ¶¶ 71-73; D.C. Cplt. ¶¶ 71-73; Idaho Cplt. ¶¶ 90-92; Ill. Cplt. ¶¶ 58-60; Iowa Cplt. ¶¶ 68; Mo. Cplt. ¶¶ 82-84; N.C. Cplt. ¶¶ 54-56; Pa. Cplt. ¶¶ 42-44; S.C. Cplt. ¶¶ 71-73; Tenn. Cplt. ¶¶ 80-82; Wash. Cplt. ¶¶ 65-67.

Statements from S&P's Code of Conduct: Ariz. Cplt. ¶¶ 74-81; Ark. Cplt. ¶¶ 73-80; Conn. Cplt. ¶¶ 79-86; Colo. Cplt. ¶¶ 72-78; Del. Cplt. ¶¶ 74-81; D.C. Cplt. ¶¶ 74-81; Idaho Cplt. ¶¶ 93-100; Ill. Cplt. ¶¶ 61-68; Iowa Cplt. ¶¶ 69-76; Me. Cplt. ¶¶ 26-27; Miss. Cplt. ¶ 25(b)(ii); Mo. Cplt. ¶¶ 85-92; N.C. Cplt. ¶¶ 57-61; Pa. Cplt. ¶¶ 41, 45; S.C. Cplt. ¶¶ 74-81; Tenn. Cplt. ¶¶ 83-91; Wash. Cplt. ¶¶ 68-75.

[11]    Written Testimony of Susan Barnes: Ariz. Cplt. ¶¶ 84-85; Ark. Cplt. ¶¶ 83-84; Conn. Cplt. ¶¶ 89-90; Colo. Cplt. ¶¶ 81-82; Del. Cplt. ¶¶ 84-85; D.C. Cplt. ¶¶ 84-85; Idaho Cplt. ¶¶ 107-108; Ill. Cplt. ¶¶ 72-73; Iowa Cplt. ¶¶ 79-80; Mo. Cplt. ¶¶ 95-96; Pa. Cplt. ¶¶ 52-53; S.C. Cplt. ¶¶ 84-85; Tenn. Cplt. ¶¶ 94-95; Wash. Cplt. ¶¶ 78-79.

Written Testimony of Deven Sharma: Ariz. Cplt. ¶¶ 87-88; Ark. Cplt. ¶¶ 86-87; Conn. Cplt. ¶¶ 92-93; Colo. Cplt. ¶¶ 85-86; Del. Cplt. ¶¶ 87-88; D.C. Cplt. ¶¶ 87-88; Idaho Cplt. ¶¶ 110-111; Ill. Cplt. ¶ 74; Iowa Cplt. ¶¶ 82-83; Mo. Cplt. ¶¶ 98-99; Pa. Cplt. ¶¶ 54-55; S.C. Cplt. ¶¶ 86-87; Tenn. Cplt. ¶¶ 97-98; Wash. Cplt. ¶¶ 81-82.

Written Testimony of Frank Raiter: Ariz. Cplt. ¶¶ 111-113, 115; Ark. Cplt. ¶¶ 110-112, 114; Conn. Cplt. ¶¶ 117-119, 121; Colo. Cplt. ¶ 119; Del. Cplt. ¶¶ 107-109, 111; D.C. Cplt. ¶¶ 118-120, 122; Idaho Cplt. ¶¶ 130-132, 134, Ill. Cplt. ¶¶ 88-90, 93; Iowa Cplt. ¶¶ 106-108, 110; Miss. Cplt. ¶ 68; Mo. Cplt. ¶¶ 122-124, 126; Pa. Cplt. ¶¶ 59-60; S.C. Cplt. ¶¶ 119-121, 123; Tenn. Cplt. ¶¶ 125-127, 129; Wash. Cplt. ¶¶ 104-107.

PowerPoint Presentation by Elwyn Wong and Bujiang Hu: Ariz. Cplt. ¶¶ 134-135; Ark. Cplt. ¶¶ 133-134; Colo. Cplt. ¶¶ 127-128; Del. Cplt. ¶¶ 134-135; D.C. Cplt. ¶¶ 141-142; Idaho Cplt. ¶¶ 155-156; Iowa Cplt. ¶¶ 129-130; Mo. Cplt. ¶¶ 145-146; N.C. Cplt. ¶¶ 183-184; S.C. Cplt. ¶¶ 142-143; Tenn. Cplt. ¶¶ 171-172; Wash. Cplt. ¶¶ 126-127.

**Exhibit 1**

9

the complaints repeat the same allegations verbatim, so much so that the metadata for the complaint filed by the Colorado Attorney General suggests that it was copied directly from the pleadings in Connecticut.

That the states have coordinated in bringing these actions — and thus cannot seriously dispute the appropriateness of pretrial coordination — is clear. For example, S&P understands that in early January representatives of several of the states traveled to Washington D.C. to attend meetings aimed at coordination. Those efforts resulted in the simultaneous filing of 14 cases on February 5, 2013, the same day that the U.S. Department of Justice announced its own action against S&P. On that same day the states launched a coordinated media campaign announcing the nationwide wave of new litigation.[13] During a press conference held in Washington D.C. in connection with the February 5 filings, Connecticut's Attorney General George Jepsen cited the efforts of "state attorneys general from around the country to develop the multistate litigation." Transcript at 7, *Press Conference with Attorney General Eric Holder, Associate Attorney General Tony West, Deputy Assistant Attorney General Stuart Delery, Announcement*

---

*Footnote continued from previous page.*

[12]     Allegation that S&P delayed the use of updated CDO Evaluator model due to negative market feedback: Ariz. Cplt. ¶ 126; Ark. Cplt. ¶ 125; Colo. Cplt. ¶ 124; Del. Cplt. ¶ 124; D.C. Cplt. ¶ 133; Idaho Cplt. ¶ 145; Iowa Cplt. ¶ 121; Mo. Cplt. ¶ 137; N.C. Cplt. ¶ 80; S.C. Cplt. ¶134; Tenn. Cplt. ¶ 158; Wash. Cplt. ¶ 118.

Allegation that S&P senior management ignored recommendation from RMBS Surveillance and delayed large scale negative rating action for 2006 vintage subprime RMBS: Ariz. Cplt. ¶¶ 144-145; Ark. Cplt. ¶¶ 142-143; Colo. Cplt. ¶¶ 143-144; Del. Cplt. ¶¶ 145-146; D.C. Cplt. ¶¶ 159-160; Idaho Cplt. ¶¶ 168-171; Iowa Cplt. ¶¶ 138-139; Mo. Cplt. ¶¶ 155-156; N.C. Cplt. ¶¶ 92-93; S.C. Cplt. ¶¶ 158-159; Tenn. Cplt. ¶¶ 193-194; Wash. Cplt. ¶¶ 135-136.

Allegation that former president, Deven Sharma, pressured Mark Adelson and David Jacob to adjust revised counterparty criteria due to business impact: Ariz. Cplt. ¶¶ 156-158; Ark. Cplt. ¶¶ 156-158; Del. Cplt. ¶¶ 162-164; D.C. Cplt. ¶¶ 144-146; Idaho Cplt. ¶¶ 188-189, 191-193, 195-196; Iowa Cplt. ¶¶ 150-152; Mo. Cplt. ¶¶ 170-174; N.C. Cplt. ¶¶ 104-106; S.C. Cplt. ¶¶ 145-147; Tenn. Cplt. ¶¶ 245-248.

Allegation that Adelson and Jacobs left S&P in December 2011 and counterparty criteria was subsequently made more lenient: Ariz. Cplt. ¶¶ 161-162; Ark. Cplt. ¶¶ 161-162; Colo. Cplt. ¶ 135; Del. Cplt. ¶¶ 168-169; D.C. Cplt. ¶¶ 149-150; Idaho Cplt. ¶¶ 199-200; Iowa Cplt. ¶¶ 155-156; Mo. Cplt. ¶¶ 179-180; N.C. Cplt. ¶ 109; S.C. Cplt. ¶ 150; Tenn. Cplt. ¶¶ 253-254.

[13]     A true and correct copy of press releases issued by the Attorneys General about their coordinated effort are annexed to the Zurofsky Declaration as Exhibit B through Exhibit P.

Exhibit 1

10

*of a Major Financial Fraud Enforcement Action, Washington, D.C.* (Feb. 5, 2013) (hereinafter "*AG Press Conference*").[14] Attorney General Jepsen further alluded to coordination among the states over the relief sought in the various actions. *Id.* Having thus cooperated and coordinated in filing and announcing these cases, the Attorneys General have no legitimate basis on which to oppose litigating them on a coordinated basis as well.

### The Declaratory Judgment Actions

In addition to the State Actions, S&P seeks to transfer two declaratory judgment actions, which S&P originally filed in federal district court in Tennessee and South Carolina ("the Declaratory Judgment Actions") prior to the commencement of an action against S&P by the Attorney General in those states. S&P has filed an amended complaint in each action to reflect the subsequent initiation of proceedings against it by the Attorneys General in each state.

Both actions seek a declaration stating that the initiation and/or prosecution of the applicable State Action by the Attorney General violates the U.S. Constitution and should be enjoined. Specifically, each alleges that credit rating opinions are speech protected by the First Amendment and, as a result, cannot serve as the basis for liability unless made with, at the least, "actual malice," *i.e.*, knowing falsity or reckless disregard for the truth, *see Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 531 (6th Cir. 2007); *Jefferson County Sch. Dist. No. R-1* v. *Moody's Investor's Services, Inc.*, 175 F.3d 848, 856 (10th Cir. 1999). Because the state statutes under which each Attorney General seeks to sue S&P may permit a finding of liability on less than such a showing, S&P requests a declaration that such actions would violate the Constitution. In addition, S&P alleges that the relief requested in each State Action will effectively burden interstate commerce in excess of the purported local benefit and will require S&P to conform to a regulatory standard with respect to potential conflicts of interest that conflicts

---

[14]     A true and correct copy of the transcript of the AG Press Conference is annexed to the Zurofsky Declaration as <u>Exhibit Q</u>.

Exhibit 1

11

with the scheme established by Congress. As a result, S&P requests a declaration that such relief would violate the Commerce and Supremacy Clauses of the Constitution.

The Attorneys General each moved to dismiss the respective Declaratory Judgment Actions, which motions became moot upon S&P's filing of an amended complaint.

**ARGUMENT**

Title 28 U.S.C. § 1407 authorizes the Panel to transfer two or more civil cases for consolidated or coordinated pretrial proceedings upon its determination that (i) the cases "involv[e] one or more common questions of fact," (ii) transfer will "be for the convenience of [the] parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of such actions." All of these criteria are satisfied here.

### A. The actions involve numerous common questions of fact.

Transfer is warranted in this case because each of the actions involves the same core factual narrative, often predicated on identically phrased factual allegations. *See, e.g.*, *In re: Skelaxin (Metaxalone) Antitrust Litigation*, 856 F. Supp. 2d 1350, 1351-52 (J.P.M.L. 2012) (centralizing actions premised on "nearly identical factual allegations"); *In re: Zurn Pex Plumbing Products Liability Litigation*, 572 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008) (same). Common factual questions will include at the very least: (i) the nature of credit ratings and the credit rating process; (ii) the nature of the structured finance market and S&P's role in connection with it; (iii) how S&P developed the rating methodologies at issue; (iv) how S&P analysts applied those methodologies during the relevant time periods; (v) how S&P managed potential conflicts resulting from the "issuer pays" compensation model; and (vi) what the public knew about S&P's rating methodologies and its management of potential conflicts of interest. The Panel has repeatedly found that centralization is appropriate where the actions involve multiple, complex questions of fact. *See, e.g.*, *In re Capital One Bank Credit Card Terms Litigation*, 201 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) (centralization warranted; actions "share sufficient complex common ques-

Exhibit 1

12

tions of fact arising out of Capital One's credit card practices"); *In re First National Bank, Heavener, Okl. (First Mortgage Revenue Bonds) Securities Litigation*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (centralization warranted; actions arose from the "same factual situation and share numerous complex questions of fact").

       Transfer is also warranted because the State Actions each seek similar relief, notably preliminary and/or permanent injunctive relief regulating S&P's credit rating activities. Absent transfer, these activities, which are both subject to federal regulation and afforded First Amendment protection, will be subject to overlapping and potentially conflicting standards in each of the State Actions. The Panel has found centralization justified under such circumstances. *See In re Operation of Missouri River System Litigation*, 277 F. Supp. 2d 1378, 1379 (J.P.M.L. 2003) (transfer necessary to prevent inconsistent rulings with respect to preliminary injunctive relief "imposing or threatening to impose conflicting standards of conduct"); *see also In re Terminix Employment Practices Litigation*, 466 F. Supp. 2d 1354, 1355 (J.P.M.L. 2006) (transfer warranted where plaintiffs sought "similar relief, including injunctive relief and damages"); *In re Wireless Telephone Services Antitrust Litigation*, 249 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003) (transfer warranted where plaintiffs sought "similar relief including an injunction prohibiting the alleged wrongful conduct").

**B.**     ***Transfer will promote convenience for the parties and witnesses and advance the just and efficient conduct of the actions.***

       The convenience of the parties, the witnesses and conservation of judicial resources also weigh heavily in favor of transfer here. As noted, S&P seeks to transfer seventeen State Actions (and two Declaratory Judgment Actions) currently pending in seventeen different districts, representing eleven of the twelve federal circuits. Absent transfer, Movants will be subjected to inconsistent schedules for conferences and hearings, forced to respond to duplicative discovery demands and litigate overlapping discovery disputes, and required to prepare for and attend redundant depositions. Given the identity of factual issues across the actions, conceivably

Exhibit 1

13

each of Movants' witnesses could have their depositions taken in every action and forced to provide the same testimony on the same issues repeatedly. Centralization would enable a single court to formulate a comprehensive pretrial program, minimizing witness inconvenience and overall expense, and to manage the undoubtedly extensive pretrial motion practice. Such concerns often warrant centralization. *See In re: Tribune Co. Fraudulent Conveyance Litigation*, 831 F. Supp. 2d 1371, 1372 (Dec. 19, 2011) ("Given the number of pending actions, centralization likely will result in a significant savings of time and money for the parties and the courts."); *see also In re MLR, LLC, Patent Litigation*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003); *In re Cygnus Telecommunications Technology, LLC, Patent Litigation*, 177 F. Supp. 2d 1375, 1376 (J.P.M.L. 2001).

As noted above, centralization will avoid duplicative and potentially conflicting pretrial rulings on important issues of law. *See, e.g.*, *In re: Coloplast Corp. Pelvic Support System Products Liability Litigation*, 883 F. Supp. 2d 1348, 1348 (Aug. 6, 2012). Centralization will also conserve scarce judicial resources. The actions are currently pending before seventeen different district court judges. Absent transfer, each will have to attend conferences and hearings, resolve discovery disputes and consider pretrial motions — efforts that could be avoided completely by centralization. *See In re: Royal Alliance Associates, Inc., Securities Litigation*, 856 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) ("[T]he potential for eliminating duplicative discovery and related motion practice, as well as the chance to conserve judicial resources (with a single judge, rather than five judges in four districts) all weigh in favor of centralization.").

## C.       There is no articulable prejudice to the Attorneys General.

Nor would transfer pose any articulable prejudice to the Attorneys General, another relevant factor in the analysis. *E.g.*, *In re: Foot Locker, Inc.*, 787 F. Supp. 2d 1364, 1365 (J.P.M.L. 2011). The Attorneys General have already coordinated extensively amongst themselves by collectively investigating the factual basis for the actions, preparing the cases for filing,

Exhibit 1

14

filing the cases (including a coordinated public relations campaign around those filings) and, as S&P understands it, in cooperatively managing document collection and review efforts to date. This level of cooperation is nowhere more evident than the collective initiation of the State Actions, as announced at the February 5, 2013 press conference. Indeed, one of the Attorneys General himself referred to these cases as "multistate litigation," noting that he was "working more and more with state attorneys general from around the country to develop the multistate litigation" and that his state "looks forward to partnering with its state colleagues" in the State Actions. Transcript at 8, *AG Press Conference*.

Not only do these facts effectively concede the appropriateness (and, indeed, necessity) of centralization here, but they also highlight a particular inequity in permitting the actions to proceed separately: doing so would enable the Attorneys General to realize for themselves the savings associated with consolidation while unilaterally imposing on S&P (and its employees who might be witnesses) the costs of defending all of the litigations separately. *See generally In re: Countrywide Financial Corp. Mortgage Marketing and Sales Practices Litigation*, 582 F. Supp. 2d 1373, 1375 (J.P.M.L. 2008) (consolidating actions by Attorneys General of California and Illinois over their objection).

**D.** *The Actions should be transferred to the Southern District of New York.*

As noted above, each of the State Actions is based on the theory that representations by S&P about the "independence" and "objectivity" of its ratings process for certain structured finance ratings were rendered "false" by S&P's use of outdated models and analysis as a result of an alleged conflict of interest. Two courts, both within the Southern District of New York, would be ideally suited to preside over these claims:

- First, the same purported misrepresentations about S&P's "independence" — indeed, in some instances, the exact same representations — were the central subject of a case previously pending before Judge Sidney H. Stein. *See Reese* v. *The McGraw-Hill*

Exhibit 1

15

*Cos., Inc., et al.*, No. 08 Civ. 7202 (SHS) (S.D.N.Y. Mar. 30, 2012), *aff'd sub nom.*
*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, No. 12-1776-cv, 2012
WL 6621391 (2d Cir. Dec. 20, 2012). In some instances, the specific allegations in
the complaint addressed by Judge Stein are word-for-word identical to those con-
tained in the State Actions.[15] Judge Stein, in fact, is the only federal district judge
who has previously had to evaluate the legal sufficiency of these very statements and
their relationship to allegations about "corrupted" ratings methodologies for struc-
tured finance securities. *See In re Pharmastem Therapeutics, Inc., Patent Litigation*,
360 F. Supp. 2d 1362, 1364 (J.P.M.L. 2005) (selecting a transferee judge who was
"already familiar with many of the technological and legal issues").

- Second, with respect to the structured finance securities at issue in these cases (*i.e.*,
  residential mortgage-backed securities and collateral debt obligations backed by
  them) Judge Lewis A. Kaplan was the first to decide a claim brought against S&P
  premised on allegations that it used "outdated models" as purportedly "revealed" by
  the same Congressional testimony from former S&P employees that permeates the
  State Actions. *See In re Lehman Brothers Securities & ERISA Litigation*, 681 F.
  Supp. 2d 495 (2010), *aff'd In re Lehman Brothers Mortgage-Backed Securities Liti-*
  *gation*, 650 F.3d 167 (2d Cir. 2011).[16]

---

[15]   To take just one example, the Complaint in *Boca Raton* quoted the statement: "Since any struc-
tured finance transaction involves complex structures and the transfer of complex credit risks, the
key to a successful transaction is an independent and objective analysis of both the structure and
the credit risk. And it is in this function that Standard & Poor's Structured Finance ratings have
excelled.." Cplt. ¶ 271. The quote is repeated in several of the State Action complaints, *see* Ariz.
Cplt. ¶ 3; Ark. Cplt. ¶ 3; Conn. Cplt. ¶ 3; Del. Cplt. ¶ 3; D.C. Cplt. ¶ 9; Ill. Cplt. ¶ 3; Iowa Cplt. ¶
3; Mo. Cplt. ¶ 18; S.C. Cplt. ¶ 10; Tenn. Cplt. ¶ 6; Wash. Cplt. ¶ 3, and was specifically ad-
dressed by Judge Stein, *see Boca Raton Firefighters & Police Pension Fund*, 2012 WL 6621391
at *1-2 (quoting district court order).

[16]   *Compare* Consolidated Securities Class Action Complaint ¶¶ 165-167, *In re Lehman Brothers*
*Securities and ERISA Litigation*, No. 08-CV-6762, 09 MD 2017 (Feb. 27, 2009), *with* Ariz. Cplt.
¶¶ 107, 109-113; Ark. Cplt. ¶¶ 106, 108-112; Conn Cplt. ¶¶ 113-119; Del. Cplt. ¶¶ 103, 105-109;
D.C. Cplt. ¶¶ 114, 116-120; Idaho Cplt. ¶¶ 125, 128-132 ; Ill. Cplt. ¶¶ 84-90; Iowa Cplt. ¶¶ 102,
104-108; Miss. Cplt. ¶¶ 67-69; Mo. Cplt. ¶¶ 118, 120-124; S.C. Cplt. ¶¶ 115, 117-121; Tenn.
Cplt. ¶¶ 121, 123-127; Wash. Cplt. ¶¶ 100, 102-106, relying on Congressional Testimony by

*Footnote continued on next page.*

**Exhibit 1**

16

These courts would also be appropriate since they are located in the Southern District of New York, where Movants have their principal place of business and where most, if not all, of their documents and witnesses are located. *See In re: Maxim Integrated Products, Inc., Patent Litigation*, 867 F. Supp. 2d 1333, 1336 (J.P.M.L. 2012); *In re Southeast Properties Ltd. Partnership Investor Litigation*, 796 F. Supp. 538, 539 (J.P.M.L. 1992). New York is also the location where the alleged wrongful conduct occurred: the allegedly false statements about independence and objectivity were generated from New York, as were S&P's ratings of structured finance products. *See, e.g.*, *In re Department of Veterans Affairs (VA) Data Theft Litigation*, 461 F. Supp. 1367, 1369 (J.P.M.L. 2006); *In re Air Crash Near Kirksville, Missouri, on October 19, 2004*, 383 F. Supp. 2d 1382, 1383 (J.P.M.L. 2005). The Southern District of New York is also an appropriate forum due to the court's expertise and long history of handling complex securities matters. *See e.g.*, *Tsereteli* v. *Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 218 (S.D.N.Y. 2012) (Southern District "is well known to have expertise in securities law"); *Albert Fadem Trust* v. *Duke Energy Corp.*, 214 F. Supp. 2d 341, 344 (S.D.N.Y. 2002). The district is easily accessible to all parties and, as the Panel has recognized, "possesses the necessary resources to be able to devote the substantial time and effort to pretrial matters that this complex docket is likely to require." *In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002).

---

*Footnote continued from previous page.*

Frank Raiter and alleging that S&P developed but failed to properly update a statistical model that estimated the default and losses of individual loans and pools of loans.

Exhibit 1

17

## CONCLUSION

The actions should be transferred pursuant to 28 U.S.C. § 1407 for consolidated or coordinated pretrial proceedings to either Judge Stein or Judge Kaplan in the U.S. District Court for the Southern District of New York.

Dated:     March 8, 2013
            New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP


By:   /s/ Floyd Abrams
           Floyd Abrams
*Attorneys for the Movants*
Office and P.O. Address:
80 Pine Street
New York, New York 10005-1772
(212) 701-3000

Exhibit 1